MICHAEL R. LOZEAU (State Bar No. 142893)
DOUGLAS J. CHERMAK (State Bar No. 233382)
Lozeau Drury LLP
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel: (510) 749-9102
Fax: (510) 749-9103 (fax)
E-mail: michael@lozeaudrury.com
        doug@lozeaudrury.com

ANDREW L. PACKARD (State Bar No. 168690)
MICHAEL P. LYNES (State Bar No. 230462)
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (415) 763-9227
E-mail: andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

ORIGINAL
FILED

JUL 2 1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

**SC**

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE, a non-profit
corporation,

Plaintiff,

vs.

WASTE MANAGEMENT OF
ALAMEDA COUNTY, INC., a
corporation.

Defendant.

Case No. 08 - 03497

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

(Federal Water Pollution Control Act,
33 U.S.C. §§ 1251 to 1387)

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, by and through its

counsel, hereby alleges:

## I.   INTRODUCTION

1.      This complaint seeks relief for Defendant's discharges of polluted storm water

and non-storm water pollutants from Defendant's facility ("the Facility") into the waters of

the United States in violation of the Act and the State of California's "Waste Discharge

COMPLAINT                                  1

1   Requirements (WDRs) For Discharges of Storm Water Associated With Industrial Activities
2   Excluding Construction Activities," State Water Resources Control Board ("State Board")
3   Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ
4   and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System
5   ("NPDES") Permit No. CAS000001, (hereinafter "the Order" or "Permit").  Defendant's
6   violations of the discharge, treatment technology, monitoring requirements, and other
7   procedural and substantive requirements of the Permit and the Act are ongoing and
8   continuous.

9       2.      The failure on the part of persons and facilities such as Defendant and its
10  industrial facility to comply with storm water requirements is recognized as a significant
11  cause of the continuing decline in water quality of the San Francisco Bay ("Bay") and other
12  area receiving waters.  The general consensus among regulatory agencies and water quality
13  specialists is that storm pollution amounts to a substantial portion of the total pollution
14  entering the aquatic environment each year.  With every rainfall event, millions of gallons of
15  polluted rainwater originating from industries within the surrounding area pour into the Bay.

16      3.      The continuing decline in water quality in the San Francisco Bay is a matter of
17  serious public concern.  Data gathered by CalFed, a coalition of fifteen state and federal
18  agencies analyzing water allocation issues, has confirmed that the Bay is a heavily polluted
19  water body.  The entire Bay and all of its major tributaries have been identified by the State
20  Board, the Regional Board, and EPA as impaired water bodies under Section 303(d) of the
21  Clean Water Act.  33 U.S.C. § 1313(d).

22  **II.      JURISDICTION AND VENUE**

23      4.      This is a civil suit brought under the citizen suit enforcement provisions of the
24  Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or
25  "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter
26  of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28
27  U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is
28  authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of

COMPLAINT

1 actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§

2 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

3      5.     On or about April 21, 2008, Plaintiff provided notice of Defendant's violations

4 of the Act, and of its intention to file suit against Defendant, to the Defendant; the

5 Administrator of the United States Environmental Protection Agency ("EPA"); the

6 Administrator of EPA Region IX; the Executive Director of the State Water Resources

7 Control Board ("State Board"); and to the Executive Officer of the Regional Water Quality

8 Control Board, San Francisco Bay Region ("Regional Board"). A true and correct copy of

9 CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

10      6.     More than sixty days have passed since notice was served on Defendant and

11 the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that

12 neither the EPA nor the State of California has commenced or is diligently prosecuting a

13 court action to redress the violations alleged in this complaint. This action's claim for civil

14 penalties is not barred by any prior administrative penalty under Section 309(g) of the Act,

15 33 U.S.C. § 1319(g).

16      7.     Venue is proper in the Northern District of California pursuant to Section

17 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located

18 within this judicial district. Pursuant to Local Rule 3-2(c), intradistrict venue is proper in

19 Oakland, California because the sources of the violations are located within Alameda

20 County, California.

21 **III.**    **PARTIES**

22      8.     Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

23 ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of

24 California with its main office in Stockton, California. CSPA has approximately 2,000

25 members who live, recreate and work in and around waters of the State of California,

26 including the San Francisco Bay. CSPA is dedicated to the preservation, protection, and

27 defense of the environment, the wildlife and the natural resources of all waters of California.

28 To further these goals, CSPA actively seeks federal and state agency implementation of the

COMPLAINT

1   Act and other laws and, where necessary, directly initiates enforcement actions on behalf of

2   itself and its members.

3       9.      Members of CSPA reside in and around the Bay and enjoy using the Bay for

4   recreation and other activities.  Members of CSPA use and enjoy the waters into which

5   Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.

6   Members of CSPA use those areas to fish, sail, boat, kayak, swim, bird watch, view wildlife

7   and engage in scientific study including monitoring activities, among other things.

8   Defendant's discharges of pollutants threaten or impair each of those uses or contribute to

9   such threats and impairments.  Thus, the interests of CSPA's members have been, are being,

10  and will continue to be adversely affected by Defendant's failure to comply with the Clean

11  Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused

12  by Defendant's activities.

13      10.     Plaintiff is informed and believes, and thereupon alleges, that Defendant

14  WASTE MANAGEMENT OF ALAMEDA COUNTY, INC. (hereinafter "Defendant" or

15  "Waste Management") is a corporation organized under the laws of California.  Defendant

16  Waste Management operates the Davis Street Transfer Station, a transfer station for

17  municipal and solid waste, in San Leandro, California.

18  **IV.    STATUTORY BACKGROUND**

19      11.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

20  pollutant into waters of the United States, unless such discharge is in compliance with

21  various enumerated sections of the Act.  Among other things, Section 301(a) prohibits

22  discharges not authorized by, or in violation of, the terms of an NPDES permit issued

23  pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

24      12.     Section 402(p) of the Act establishes a framework for regulating municipal and

25  industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States

26  with approved NPDES permit programs are authorized by Section 402(p) to regulate

27  industrial storm water discharges through individual permits issued to dischargers or through

28  the issuance of a single, statewide general permit applicable to all industrial storm water

COMPLAINT

4

1   dischargers.  33 U.S.C. § 1342(p).

2         13.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the

3   U.S. EPA has authorized California's State Board to issue NPDES permits including general

4   NPDES permits in California.

5         14.    The State Board elected to issue a statewide general permit for industrial storm

6   water discharges.  The State Board issued the General Permit on or about November 19,

7   1991, modified the General Permit on or about September 17, 1992, and reissued the

8   General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water

9   Act, 33 U.S.C. § 1342(p).

10         15.    In order to discharge storm water lawfully in California, industrial dischargers

11   must comply with the terms of the General Permit or have obtained and complied with an

12   individual NPDES permit.  33 U.S.C. § 1311(a).

13         16.    The General Permit contains several prohibitions.  Effluent Limitation B(3) of

14   the General Permit requires dischargers to reduce or prevent pollutants in their storm water

15   discharges through implementation of the Best Available Technology Economically

16   Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional

17   Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include

18   both nonstructural and structural measures. General Permit, Section A(8).  Discharge

19   Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-

20   storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

21   Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to

22   any surface or ground water that adversely impact human health or the environment.

23   Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that

24   cause or contribute to an exceedance of any applicable water quality standards contained in a

25   Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

26         17.    EPA has established Parameter Benchmark Values as guidelines for

27   determining whether a facility discharging industrial storm water has implemented the

28   requisite BAT and BCT. 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  EPA has established

COMPLAINT

1   Parameter Benchmark Values for the following parameters, among others: total suspended

2   solids – 100 mg/L; aluminum – 0.75 mg/L; copper – 0.0636 mg/L; iron – 1.0 mg/L; zinc –

3   0.117 mg/L; lead – 0.0816 mg/L; oil & grease – 15 mg/L; chemical oxygen demand – 120

4   mg/L.  The California State Water Resources Control Board has proposed a Benchmark

5   Value for electrical conductance of 200 μmhos/cm.

6        18.    In addition to absolute prohibitions, the General Permit contains a variety of

7   substantive and procedural requirements that dischargers must meet. Facilities discharging,

8   or having the potential to discharge, storm water associated with industrial activity that have

9   not obtained an individual NPDES permit must apply for coverage under the State's General

10   Permit by filing a Notice of Intent To Comply ("NOI").  The General Permit requires

11   existing dischargers to have filed their NOIs before March 30, 1992.

12        19.    Dischargers must develop and implement a Storm Water Pollution Prevention

13   Plan ("SWPPP").  The SWPPP must describe storm water control equipment and measures

14   that comply with the BAT and BCT standards.  The General Permit requires that an initial

15   SWPPP has been developed and implemented before October 1, 1992.  The SWPPP must,

16   among other requirements, identify and evaluate sources of pollutants associated with

17   industrial activities that may affect the quality of storm and non-storm water discharges from

18   the facility and identify and implement site-specific best management practices ("BMPs") to

19   reduce or prevent pollutants associated with industrial activities in storm water and

20   authorized non-storm water discharges (Section A(2)).  The SWPPP's BMPs must

21   implement BAT and BCT (Section B(3)).  The SWPPP must include: a description of

22   individuals and their responsibilities for developing and implementing the SWPPP (Section

23   A(3)); a site map showing the Facility boundaries, storm water drainage areas with flow

24   pattern and nearby water bodies, the location of the storm water collection, conveyance and

25   discharge system, structural control measures, impervious areas, areas of actual and potential

26   pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials

27   handled and stored at the site (Section A(5)); a description of potential pollutant sources

28   including industrial processes, material handling and storage areas, dust and particulate

generating activities, and a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Section A(6)).  The SWPPP must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Section A(9),(10)).

20.     Section C(11)(d) of the General Permit's Standard Provisions requires dischargers to report any noncompliance to the Regional Board.  *See also* Section E(6). Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

21.     The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written monitoring and reporting program no later than October 1, 1992.  Existing facilities covered under the General Permit had to implement all necessary revisions to their monitoring programs no later than August 1, 1997.

22.     As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event

COMPLAINT

of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled."  Section B(5)(c)(i)-(iii) requires dischargers to sample and analyze during the wet season for basic parameters, such as pH, total suspended solids ("TSS"), electrical conductance, and total organic content ("TOC") or oil and grease ("O&G"), certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.

23.     Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board. The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit.  *See also* Sections C(9) and (10) and B(14).

24.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $27,500 per day (violations from January 30, 1997 through March 15, 2004) and $32,500 per day (violations after March 15, 2004) pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

25.     The Regional Board has established water quality standards for the San Francisco Bay in the Water Quality Control Plan for the San Francisco Bay Basin, generally referred to as the Basin Plan.

26.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms."

27.     The Basin Plan provides that "[w]aters shall not contain suspended material in

concentrations that cause nuisance or adversely affect beneficial uses" and that "[w]aters shall not contain biostimulatory substances in concentrations that promote aquatic growths to the extent that such growths cause nuisance or adversely affect beneficial uses."

28.     The Basin Plan limits floating material, stating that "[w]aters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."

29.     The Basin provide provides that "[t]he suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses."

30.     The Basin Plan dictates that "[w]aters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

31.     The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

32.     The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5."

33.     The Basin Plan establishes a dissolved oxygen standard of 5.0 mg/L for tidal waters of San Francisco Bay downstream from the Carquinez Bridge.

34.     The Basin Plan establishes Marine Water Quality Objectives for the following pollutants: zinc – 0.081 mg/L (4-day average), 0.090 mg/L (1-hour average); lead – 0.0081 mg/L (4-day average), 0.22 mg/L (1-hour average); and copper 0.0031 mg/L (4-day average), 0.0048 mg/L (1-hour average).

## V.     **STATEMENT OF FACTS**

35.     Defendant Waste Management operates, the Davis Street Transfer Station, a transfer station for commercial and municipal solid waste at 2615 Davis Street in San Leandro, California.  The Facility is engaged in the transfer of solid waste for disposal as well as recycling operations.  The Facility falls within the Standard Industrial Classification

("SIC") Code 5093.  The Facility covers about 53 acres, the majority of which is paved and used for transporting and storing waste materials throughout the Facility.  On information and belief, Plaintiff alleges that there are at least seven buildings located on the property.  On information and belief, Plaintiff alleges that materials transfer is conducted both inside and outside of these buildings.

36.     Defendant channels and collects storm water falling on the Facility though five storm water outfalls.  Each storm drain collects storm water runoff from a particular area of the Facility.   These outfalls discharge the storm water directly to the San Francisco Bay, or to a municipal storm drain that flows to the San Francisco Bay.

37.     The industrial activities at the site include the transfer of solid waste from collection vehicles to transport vehicles which move the waste to a remote landfill for disposal, as well as recycling operations for materials such as paper, plastic, glass, wood/yard waste, scrap metal, tires, construction debris, etc.   It also includes the storage and maintenance of trucks, tractors, and other machinery used to transfer and dispose of these materials.

38.     Significant activities at the site take place outside and are exposed to rainfall.  These activities include transfer, storage, and disposal of the numerous types of materials handled by the Facility; the storage and use of vehicles and equipment for materials handling; and the storage, handling, and disposal of waste materials.  Loading and delivery of materials occurs outside.  Trucks enter and exit the Facility directly from and to a public road.  Trucks, tractors, and other machinery are the primary means of moving materials around the Facility.  The Facility's exposed areas contain large piles of a variety of materials.  Plaintiff alleges on information and belief that many of the exposed surfaces at the Facility are unpaved and sediment and other materials are disturbed as a result of the storage and disposal processes.  These areas are exposed to storm water and storm flows due to the lack of overhead coverage, berms, and other storm water controls.

39.     Industrial machinery, heavy equipment and vehicles, including trucks and tractors are operated and stored at the Facility in areas exposed to storm water flows.

COMPLAINT

1  Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment

2  leak contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids that are

3  exposed to storm water flows, and that such machinery and equipment track sediment and

4  other contaminants throughout the Facility.

5      40.    Plaintiff is informed and believes, and thereupon alleges that the storm water

6  flows easily over the surface of the Facility, collecting suspended sediment, dirt, oils, grease,

7  and other pollutants as it flows toward the storm water drains.  Storm water and any

8  pollutants contained in that storm water entering the drains flow directly to the San Francisco

9  Bay.

10     41.    The management practices at the Facility are wholly inadequate to prevent the

11 sources of contamination described above from causing the discharge of pollutants to waters

12 of the United States.  The Facility lacks sufficient structural controls such as grading,

13 berming, roofing, containment, or drainage structures to prevent rainfall and storm water

14 flows from coming into contact with these and other exposed sources of contaminants.  The

15 Facility lacks sufficient structural controls to prevent the discharge of water once

16 contaminated.  The Facility lacks adequate storm water pollution treatment technologies to

17 treat storm water once contaminated.

18     42.    Since at least February 2, 2004, Defendant has taken samples or arranged for

19 samples to be taken of storm water discharges at the Facility.  The sample results were

20 reported in the Facility's annual reports submitted to the Regional Board.  Defendant Waste

21 Management certified each of those annual reports pursuant to Sections A and C of the

22 General Permit.

23     43.    Since at least February 2, 2004, the Facility has detected total suspended

24 solids, chemical oxygen demand, oil & grease, aluminum, copper, iron, zinc, lead, and

25 electrical conductance in storm water discharged from the Facility.  Levels of these

26 pollutants detected in the Facility's storm water have been in excess of EPA's numeric

27 parameter benchmark values.   Levels of these pollutants detected in the Facility's storm

28 water have been in excess of water quality standards established in the Basin Plan.

COMPLAINT

44.     The levels of total suspended solids in storm water detected by the Facility have exceeded the benchmark value for total suspended solids of 100 mg/L established by EPA.  For example, on May 19, 2006, the level of suspended solids measured by Defendant in the Facility's discharged storm water was 1,800 mg/L.  That level of total suspended solids is 18 times the benchmark value for suspended solids established by EPA.

45.     The levels of chemical oxygen demand in storm water detected by the Facility have exceeded the benchmark value for chemical oxygen demand of 120 mg/L established by EPA.  For example, on May 19, 2006, the level of chemical oxygen demand measured by Defendant in the Facility's discharged storm water was 630 mg/L.  That level of chemical oxygen demand is over five times the benchmark value for chemical oxygen demand established by EPA.

46.     The levels of oil & grease in storm water detected by the Facility have exceeded the benchmark value for oil & grease of 15 mg/L established by EPA.  For example, on November 4, 2005, the level of oil & grease measured by Defendant in the Facility's discharged storm water was 52 mg/L.  That level of oil & grease is nearly three and a half times the benchmark value for oil & grease established by EPA.

47.     The levels of aluminum in storm water detected by the Facility have exceeded the benchmark value for aluminum of 0.75 mg/L established by EPA.  For example, on May 19, 2006, the level of aluminum measured by Defendant in the Facility's discharged storm water was 220 mg/L.  That level of aluminum is over 293 times the benchmark value for aluminum established by EPA.

48.     The levels of copper in storm water detected by the Facility have exceeded the benchmark value for copper of 0.0636 mg/L established by EPA.  For example, on May 19, 2006, the level of copper measured by Defendant in the Facility's discharged storm water was 1.8 mg/L.  That level of copper is over 28 times the benchmark value for copper established by EPA.

49.     The levels of iron in storm water detected by the Facility have exceeded the benchmark value for iron of 1.0 mg/L established by EPA.  For example, on May 19, 2006,

COMPLAINT

the level of iron measured by Defendant in the Facility's discharged storm water was 310 mg/L.  That level of iron is 310 times the benchmark value for iron established by EPA.

50.     The levels of zinc in storm water detected by the Facility have exceeded the benchmark value for zinc of 0.117 mg/L established by EPA.  For example, on May 19, 2006, the level of zinc measured by Defendant in the Facility's discharged storm water was 11 mg/L.  That level of zinc is over 94 times the benchmark value for zinc established by EPA.

51.     The levels of lead in storm water detected by the Facility have exceeded the benchmark value for lead of 0.0816 mg/L established by EPA.  For example, on May 19, 2006, the level of lead measured by Defendant in the Facility's discharged storm water was 3.4 mg/L.  That level of lead is nearly 42 times the benchmark value for lead established by EPA.

52.     The electrical conductance levels detected by the Facility in its storm water have been greater than the numeric water quality standards applicable to electrical conductance in California.  The electrical conductance levels detected by the Facility in its storm water have been greater than the benchmark value of 200 µmho/cm proposed by the State Board.  For example, on May 19, 2006, the electrical conductance level measured by Defendant in the Facility's discharged storm water was 1500 µmho/cm.  That electrical conductance level is over seven times the State Board's proposed benchmark value.

53.     On information and belief, Plaintiff alleges that Defendants have failed to sample or monitor any storm water discharge locations during the 2004-2005 and 2006-2007 rainy seasons in violation of Sections B(4) and B(5) of the General Permit.

54.     On information and belief, Plaintiff alleges that since at least February 2, 2004, Defendant has failed to implement BAT and BCT at the Facility for its discharges of total suspended solids, chemical oxygen demand, oil & grease, aluminum, copper, iron, zinc, lead, and electrical conductance.  Section B(3) of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has

1   failed to implement BAT and BCT.

2        55.     On information and belief, Plaintiff alleges that since at least October 1, 1992,

3   Defendant has failed to implement an adequate SWPPP for the Facility.  Plaintiff is informed

4   and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set

5   forth site-specific best management practices for the Facility that are consistent with BAT or

6   BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the

7   SWPPP prepared for the Facility does not include an assessment of potential pollutant

8   sources, structural pollutant control measures employed by the Defendant, a list of actual and

9   potential areas of pollutant contact, or a description of best management practices to be

10   implemented at the Facility to reduce pollutant discharges.  According to information

11   available to CSPA, Defendant's SWPPP has not been evaluated to ensure effectiveness and

12   revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and

13   believes, and thereupon alleges, that the SWPPP does not include each of the mandatory

14   elements required by Section A of the General Permit.  Plaintiff is informed and believes,

15   and thereupon alleges, that the SWPPP does not contain an accurate map that clearly

16   delineates the boundaries of the Facility.

17        56.     Information available to CSPA indicates that as a result of these practices,

18   storm water containing excessive pollutants is being discharged during rain events from the

19   Facility directly to the San Francisco Bay.

20        57.     The San Francisco Bay has been identified by the Regional Board, State Board

21   and federal EPA as impaired for several pollutants, including mercury and unknown toxicity.

22        58.     Plaintiff is informed and believes, and thereupon alleges, that pollutants

23   discharged by the Facility in its storm water are contributing to violations of water quality

24   standards that apply to the San Francisco Bay and its tributaries.  Plaintiff is informed and

25   believes, and thereupon alleges, that Defendant is discharging total suspended solids,

26   chemical oxygen demand, oil & grease, aluminum, copper, iron, zinc, lead, electrical

27   conductance, and other un-monitored pollutants that are causing or contributing to

28   exceedances of applicable water quality standards.  Defendant is contributing to violations of

COMPLAINT

water quality standards including, but not limited to, the narrative water quality standard for toxicity and turbidity and the numeric water quality standard for electrical conductance.

59.     Plaintiff is informed and believes that Defendant failed to submit to the Regional Board a true and complete annual report certifying compliance with the General Permit since at least February 2, 2004.  Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant must submit an annual report, that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and certifying compliance with the General Permit.  Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete annual reports that purported to comply with the General Permit when there was significant noncompliance at the Facility.

60.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of polluted storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Develop and Implement the Best Available and
Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

61.     Plaintiff realleges and incorporate Paragraphs 1-60, as if fully set forth herein.

62.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of suspended solids, chemical oxygen demand, oil & grease, aluminum, copper, iron, zinc, lead, electrical conductance and other un-monitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

63.     Each day since October 1, 1992 that Defendant has failed to develop and

COMPLAINT

15

implement BAT and BCT in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

64.     Defendant has been in violation of the BAT/BCT requirements every day since October 1, 1992.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT and BCT at the Facility.

**SECOND CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

65.     Plaintiff realleges and incorporate Paragraphs 1-64, as if fully set forth herein.

66.     Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing an adequate SWPPP no later than October 1, 1992.

67.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's outdoor storage of various materials, without appropriate best management practices; the continued exposure of significant quantities of various materials to storm water flows; the continued exposure and tracking of waste resulting from the operation or maintenance of vehicles at the site; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values.

68.     Defendant has failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

69.      Each day since October 1, 1992 that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

70.     Defendant has been in violation of the SWPPP requirements every day since October 1, 1992.  Defendant continues to be in violation of the SWPPP requirements each day

that it fails to develop and fully implement an adequate SWPPP for the Facility.

### THIRD CAUSE OF ACTION
**Failure to Develop and Implement an Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

71.    Plaintiff re-alleges and incorporates Paragraphs 1-70, inclusive, as if fully set forth herein.

72.    Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

73.    Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, their failure to monitor and sample storm water discharges during the 2004-2005 and 2006-2007 rainy seasons.

74.    Each day since October 1, 1992 that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

### FOURTH CAUSE OF ACTION
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311(a), 1342)**

75.    Plaintiff re-alleges and incorporates Paragraphs 1-74, inclusive, as if fully set forth herein.

76.    Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges

COMPLAINT
17

shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

77.     Plaintiff is informed and believes, and thereupon alleges, that since at least May 23, 2003, Defendant has been discharging polluted storm water from the Facility directly to the San Francisco Bay, in violation of the Discharge Prohibition A(2) of the General Permit.

78.     During every rain event, rainwater flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with these pollutants. The rainwater then flows untreated from the Facility into channels or storm drains. This contaminated storm water flows into the San Francisco Bay.

79.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of the waters of the United States in violation of Discharge Prohibition A(2) of the General Permit.

80.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

81.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

82.     Every day since at least May 23, 2003, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

### FIFTH CAUSE OF ACTION
**False Certification of Compliance In Annual Report**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

83.     Plaintiff realleges and incorporate Paragraphs 1-82, as if fully set forth herein.

84.     Defendant has falsely certified compliance with the General Permit in each of

COMPLAINT

18

1   the annual reports submitted to the Regional Board since at least June 2004.

2       85.     Each day since at least June 29, 2004 that Defendant has falsely certified

3   compliance with the General Permit is a separate and distinct violation of the General Permit

4   and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of

5   the General Permit's certification requirement each day that it maintains its false certification

6   of its compliance with the General Permit.

7   **VII.   <u>RELIEF REQUESTED</u>**

8       Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

9       a.   Declare Defendant to have violated and to be in violation of the Act as

10  alleged herein;

11      b.   Enjoin Defendant from discharging polluted storm water from the Facility

12  unless authorized by the Permit;

13      c.   Enjoin Defendant from further violating the substantive and procedural

14  requirements of the Permit;

15      d.   Order Defendant to immediately implement storm water pollution control

16  and treatment technologies and measures that are equivalent to BAT or BCT and prevent

17  pollutants in the Facility's storm water from contributing to violations of any water quality

18  standards;

19      e.   Order Defendant to comply with the Permit's monitoring and reporting

20  requirements, including ordering supplemental monitoring to compensate for past monitoring

21  violations;

22      f.   Order Defendant to prepare a SWPPP consistent with the Permit's

23  requirements and implement procedures to regularly review and update the SWPPP;

24      g.   Order Defendant to provide Plaintiff with reports documenting the quality

25  and quantity of their discharges to waters of the United States and their efforts to comply with

26  the Act and the Court's orders;

27      h.   Order Defendant to pay civil penalties of $27,500 per day per violation for

28  all violations occurring before March 15, 2004, and $32,500 per day per violation for all

COMPLAINT

19

1   violations occurring after August 28, 2002, for each violation of the Act pursuant to Sections

2   309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

3          i.   Order Defendant to take appropriate actions to restore the quality of waters

4   impaired or adversely affected by their activities;

5          j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness,

6   compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

7          k.   Award any such other and further relief as this Court may deem appropriate.

8

9   Dated: July 21, 2008                    Respectfully submitted,

10                                          LOZEAU DRURY LLP

11                                          By:

12                                          Douglas J. Chermak
                                            Attorney for Plaintiff
13                                          CALIFORNIA SPORTFISHING PROTECTION
                                            ALLIANCE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
                                            20

# EXHIBIT A

# California Sportfishing Protection Alliance
*"An Advocate for Fisheries, Habitat and Water Quality"*
**3536 Rainier Avenue, Stockton, CA 95204**
**Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com**

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

April 16, 2008

Jack Isola, Manager
Davis Street Station for Material Recycling and Transfer
Waste Management of Alameda County, Inc.
2615 Davis Street
San Leandro, CA  94577

Stuart Clark, President
Waste Management of Alameda County, Inc.
172 98th Ave
Oakland, CA  94603

Waste Management of California, Inc.
1001 Fannin, Suite 4000
Houston, TX  77002

**Re:     Notice of Violations and Intent to File Suit Under the Federal Water
          Pollution Control Act**

Dear Mr. Isola and Mr. Clark:

      I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("Act") that CSPA believes are occurring at the Davis Street Station for Material Recycling and Transfer  ("Facility") located at 2615 Davis Street in San Leandro, California.   CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the San Francisco Bay and other California waters. This letter is being sent to you as the responsible owners, officers, or operators of the Facility (all recipients are hereinafter collectively referred to as "Davis Street Station").

      This letter addresses Davis Street Station's unlawful discharge of pollutants from the Facility into San Francisco Bay.  The Facility is discharging storm water pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board") Order No. 92-12-DWQ as amended by Order No. 97-03-DWQ (hereinafter "General Permit").  The WDID identification number for the Facility listed on documents submitted to the Regional Board is 201I002422.  The Facility is engaged in ongoing violations of the substantive and

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 2 of 17

procedural requirements of the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Davis Street Station is hereby placed on formal notice by CSPA that, after the expiration of sixty days from the date of this Notice of Violation and Intent to Sue, CSPA intends to file suit in federal court against Waste Management of Alameda County, Inc., Waste Management of California, Inc., Jack Isola, and Stuart Clark under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the Order. These violations are described more extensively below.

## I.    Background.

On November 4, 1997, Davis Street Station filed its Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI"). Davis Street Station certifies that the Facility is classified under SIC code 5093 ("processing of scrap material") and under SIC code 4212 ("local trucking without storage"). The Facility collects and discharges storm water from its 53-acre industrial site through at least five outfalls that discharge into the San Francisco Bay. The Regional Board has identified waters of San Francisco Bay as failing to meet applicable water quality standards for PCBs, selenium, exotic species, dioxins, pesticides, and mercury. *See* http://www.waterboards.ca.gov/tmdl/docs/ 303dlists2006/final/r2_final303dlist.pdf.

The Regional Board has identified beneficial uses of the Bay region's waters and established water quality standards for the San Francisco Bay in the "Water Quality Control Plan for the San Francisco Bay Basin**,**" generally referred to as the Basin Plan. *See* http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/basin_plan/docs/basin_plan07.pdf. The beneficial uses of these waters include among others contact and non-contact recreation, fish migration, endangered and threatened species habitat, shellfish harvesting, and fish spawning. The non-contact recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tide pool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities. Water quality considerations relevant to non-contact water recreation, such as hiking, camping, or boating, and those activities related to tide pool or other nature studies require protection of habitats and aesthetic features." *Id.* at 2.1.16. Visible pollution, including visible sheens and cloudy or

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 3 of 17

muddy water from industrial areas, impairs people's use of the Bay for contact and non-contact
water recreation.

The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall
be maintained free of toxic substances in concentrations that are lethal or that produce other
detrimental responses in aquatic organisms." *Id.* at 3.3.18. The Basin Plan includes a narrative
oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other
materials in concentrations that result in a visible film or coating on the surface of the water or
on objects in the water, that cause nuisance, or otherwise adversely affect beneficial uses." *Id.* at
3.3.7. The Basin Plan provides that "[w]aters shall not contain suspended material in
concentrations that cause nuisance or adversely affect beneficial uses." *Id.* at 3.3.14. The Basin
Plan establishes Marine Water Quality Objectives for zinc of 0.081 mg/L (4-day average) and
0.090 mg/L (1-hour average); copper of 0.0031 mg/L (4-day average) and 0.0048 mg/L (1-hour
average); and lead of 0.0081 mg/L (4 day average) and 0.21 mg/L (1hour average). *Id.* at Table
3-3. EPA has adopted numeric water quality standards for copper of .0031 mg/L (4-day average)
and .0048 mg/L (1-hour average), for lead of .210 mg/L (4-day average) and .0081 mg/L (1-hour
average), and for zinc of .090 mg/L (4-day average) and .081 mg/L (1-hour average). 65
Fed.Reg. 31712 (May 18, 2000).

The U.S. Environmental Protection Agency ("EPA") has published benchmark levels as
guidelines for determining whether a facility discharging industrial storm water has implemented
the requisite best available technology economically achievable ("BAT") and best conventional
pollutant control technology ("BCT"). The following benchmarks have been established for
pollutants discharged by Davis Street Station: pH – 6.0-9.0 units; total suspended solids ("TSS")
– 100 mg/L, oil and grease ("O&G") – 15 mg/L, chemical oxygen demand ("COD") – 120 mg/L,
aluminum – .75 mg/L,  zinc – 0.117 mg/L, iron – 1 mg/L, copper – .0636 mg/L, lead – .0816
mg/L. The State Water Quality Control Board also has proposed adding a benchmark level to
the General Permit for specific conductance (200 µmho/cm).

## II.     Alleged Violations of the NPDES Permit.

### A.     *Discharges in Violation of the Permit.*

Davis Street Station has violated and continues to violate the terms and conditions of the
General Industrial Storm Water Permit. Section 402(p) of the Act prohibits the discharge of
storm water associated with industrial activities, except as permitted under an NPDES permit (33
U.S.C. § 1342) such as the General Permit. The General Permit prohibits any discharges of
storm water associated with industrial activities or authorized non-storm water discharges that
have not been subjected to BAT or BCT. Effluent Limitation B(3) of the General Permit
requires dischargers to reduce or prevent pollutants in their storm water discharges through
implementation of BAT for toxic and nonconventional pollutants and BCT for conventional
pollutants. BAT and BCT include both nonstructural and structural measures. General Permit,
Section A(8). Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 4 of 17

("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

In addition, Discharge Prohibition A(1) of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Davis Street Station has discharged and continues to discharge storm water with unacceptable levels of total suspended solids, specific conductivity, oil & grease, chemical oxygen demand, aluminum, copper, iron, lead, zinc and other pollutants in violation of the General Permit.  Davis Street Station's sampling and analysis results reported to the Regional Board confirm discharges of specific pollutants and materials other than storm water in violation of the Permit provisions listed above.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

| Date | Parameter | Observed Concentration | Benchmark Value | Location (as identified by the Facility) |
|------|-----------|------------------------|-----------------|------------------------------------------|
| 5/19/2006 | Total Suspended Solids | 150 mg/L | 100 mg/L | Northwest Outfall |
| 5/19/2006 | Specific Conductivity | 1,200 µmho/cm | 200 µmho/cm (proposed) | Northwest Outfall |
| 5/19/2006 | Chemical Oxygen Demand | 630 mg/L | 120 mg/L | Northwest Outfall |
| 5/19/2006 | Aluminum | 4.5 mg/L | 0.75 mg/L | Northwest Outfall |
| 5/19/2006 | Copper | 0.07 mg/L | 0.0636 mg/L | Northwest Outfall |
| 5/19/2006 | Iron | 6.9 mg/L | 1.0 mg/L | Northwest Outfall |
| 5/19/2006 | Zinc | 0.44 mg/L | 0.117 mg/L | Northwest Outfall |

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 5 of 17

| 5/19/2006 | Total Suspended Solids | 670 mg/L | 100 mg/L | Facility Entrance |
|---|---|---|---|---|
| 5/19/2006 | Specific Conductivity | 1,200 µmho/cm | 200 µmho/cm (proposed) | Facility Entrance |
| 5/19/2006 | Chemical Oxygen Demand | 210 mg/L | 120 mg/L | Facility Entrance |
| 5/19/2006 | Aluminum | 11 mg/L | 0.75 mg/L | Facility Entrance |
| 5/19/2006 | Copper | 0.11 mg/L | 0.0636 mg/L | Facility Entrance |
| 5/19/2006 | Iron | 15 mg/L | 1.0 mg/L | Facility Entrance |
| 5/19/2006 | Lead | 0.18 mg/L | 0.0816 mg/L | Facility Entrance |
| 5/19/2006 | Zinc | 0.71 mg/L | 0.117 mg/L | Facility Entrance |
| 5/19/2006 | Total Suspended Solids | 1,800 mg/L | 100 mg/L | Northeast Outfall |
| 5/19/2006 | Specific Conductivity | 1,500 µmho/cm | 200 µmho/cm (proposed) | Northeast Outfall |
| 5/19/2006 | Chemical Oxygen Demand | 310 mg/L | 120 mg/L | Northeast Outfall |
| 5/19/2006 | Aluminum | 220 mg/L | 0.75 mg/L | Northeast Outfall |
| 5/19/2006 | Copper | 1.8 mg/L | 0.0636 mg/L | Northeast Outfall |
| 5/19/2006 | Iron | 310 mg/L | 1.0 mg/L | Northeast Outfall |
| 5/19/2006 | Lead | 3.4 mg/L | 0.0816 mg/L | Northeast Outfall |
| 5/19/2006 | Zinc | 11 mg/L | 0.117 mg/L | Northeast Outfall |
| 5/19/2006 | Total Suspended Solids | 1,500 mg/L | 100 mg/L | Southeast Outfall |
| 5/19/2006 | Specific Conductivity | 1,400 µmho/cm | 200 µmho/cm (proposed) | Southeast Outfall |
| 5/19/2006 | Chemical Oxygen Demand | 210 mg/L | 120 mg/L | Southeast Outfall |
| 5/19/2006 | Aluminum | 26 mg/L | 0.75 mg/L | Southeast Outfall |
| 5/19/2006 | Copper | 0.1 mg/L | 0.0636 mg/L | Southeast Outfall |
| 5/19/2006 | Iron | 37 mg/L | 1.0 mg/L | Southeast Outfall |
| 5/19/2006 | Lead | 0.18 mg/L | 0.0816 mg/L | Southeast Outfall |
| 5/19/2006 | Zinc | 0.58 mg/L | 0.117 mg/L | Southeast Outfall |
| 11/4/2005 | Total Suspended Solids | 500 mg/L | 100 mg/L | Facility Entrance |
| 11/4/2005 | Specific Conductivity | 990 µmho/cm | 200 µmho/cm (proposed) | Facility Entrance |
| 11/4/2005 | Oil & Grease | 52 mg/L | 15 mg/L | Facility Entrance |
| 11/4/2005 | Chemical Oxygen Demand | 280 mg/L | 120 mg/L | Facility Entrance |
| 11/4/2005 | Aluminum | 26 mg/L | 0.75 mg/L | Facility Entrance |

Notice of Violation and Intent to File Suit

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 6 of 17

| 11/4/2005 | Copper | 0.17 mg/L | 0.0636 mg/L | Facility Entrance |
|-----------|--------|-----------|-------------|-------------------|
| 11/4/2005 | Iron | 39 mg/L | 1.0 mg/L | Facility Entrance |
| 11/4/2005 | Lead | 0.32 mg/L | 0.0816 mg/L | Facility Entrance |
| 11/4/2005 | Zinc | 1.3 mg/L | 0.117 mg/L | Facility Entrance |
| 11/4/2005 | Total Suspended Solids | 200 mg/L | 100 mg/L | Recycling Center |
| 11/4/2005 | Specific Conductivity | 1,200 µmho/cm | 200 µmho/cm (proposed) | Recycling Center |
| 11/4/2005 | Oil & Grease | 43 mg/L | 15 mg/L | Recycling Center |
| 11/4/2005 | Chemical Oxygen Demand | 1,100 mg/L | 120 mg/L | Recycling Center |
| 11/4/2005 | Aluminum | 4.4 mg/L | 0.75 mg/L | Recycling Center |
| 11/4/2005 | Copper | 0.077 mg/L | 0.0636 mg/L | Recycling Center |
| 11/4/2005 | Iron | 6.9 mg/L | 1.0 mg/L | Recycling Center |
| 11/4/2005 | Lead | 0.086 mg/L | 0.0816 mg/L | Recycling Center |
| 11/4/2005 | Zinc | 0.67 mg/L | 0.117 mg/L | Recycling Center |
| 11/4/2005 | Total Suspended Solids | 840 mg/L | 100 mg/L | Northeast Outfall |
| 11/4/2005 | Specific Conductivity | 2,700 µmho/cm | 200 µmho/cm (proposed) | Northeast Outfall |
| 11/4/2005 | Oil & Grease | 78 mg/L | 15 mg/L | Northeast Outfall |
| 11/4/2005 | Chemical Oxygen Demand | 1,000 mg/L | 120 mg/L | Northeast Outfall |
| 11/4/2005 | Aluminum | 20 mg/L | 0.75 mg/L | Northeast Outfall |
| 11/4/2005 | Copper | 0.26 mg/L | 0.0636 mg/L | Northeast Outfall |
| 11/4/2005 | Iron | 29 mg/L | 1.0 mg/L | Northeast Outfall |
| 11/4/2005 | Lead | 0.36 mg/L | 0.0816 mg/L | Northeast Outfall |
| 11/4/2005 | Zinc | 1.5 mg/L | 0.117 mg/L | Northeast Outfall |
| 11/4/2005 | pH | 1.3 pH units | 6.0 – 9.0 pH units | Southeast Outfall |
| 11/4/2005 | Total Suspended Solids | 520 mg/L | 100 mg/L | Southeast Outfall |
| 11/4/2005 | Specific Conductivity | 22,000 µmho/cm | 200 µmho/cm (proposed) | Southeast Outfall |
| 11/4/2005 | Oil & Grease | 40 mg/L | 15 mg/L | Southeast Outfall |
| 11/4/2005 | Chemical Oxygen Demand | 220 mg/L | 120 mg/L | Southeast Outfall |
| 11/4/2005 | Aluminum | 41 mg/L | 0.75 mg/L | Southeast Outfall |
| 11/4/2005 | Copper | 0.26 mg/L | 0.0636 mg/L | Southeast Outfall |
| 11/4/2005 | Iron | 58 mg/L | 1.0 mg/L | Southeast Outfall |
| 11/4/2005 | Lead | 0.72 mg/L | 0.0816 mg/L | Southeast Outfall |
| 11/4/2005 | Zinc | 2.3 mg/L | 0.117 mg/L | Southeast Outfall |

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 7 of 17

| 3/25/2004 | Total Suspended Solids | 570 mg/L | 100 mg/L | North Central Out Fall |
| 3/25/2004 | Specific Conductivity | 1,200 µmho/cm | 200 µmho/cm (proposed) | North Central Out Fall |
| 3/25/2004 | Chemical Oxygen Demand | 630 mg/L | 120 mg/L | North Central Out Fall |
| 3/25/2004 | Aluminum | 12 mg/L | 0.75 mg/L | North Central Out Fall |
| 3/25/2004 | Copper | 0.14 mg/L | 0.0636 mg/L | North Central Out Fall |
| 3/25/2004 | Iron | 22 mg/L | 1.0 mg/L | North Central Out Fall |
| 3/25/2004 | Lead | 0.14 mg/L | 0.0816 mg/L | North Central Out Fall |
| 3/25/2004 | Zinc | 1.1 mg/L | 0.117 mg/L | North Central Out Fall |
| 3/25/2004 | Total Suspended Solids | 200 mg/L | 100 mg/L | North East Out Fall |
| 3/25/2004 | Chemical Oxygen Demand | 150 mg/L | 120 mg/L | North East Out Fall |
| 3/25/2004 | Aluminum | 6.8 mg/L | 0.75 mg/L | North East Out Fall |
| 3/25/2004 | Copper | 0.066 mg/L | 0.0636 mg/L | Out Fall |
| 3/25/2004 | Iron | 11 mg/L | 1.0 mg/L | North East Out Fall |
| 3/25/2004 | Zinc | 0.53 mg/L | 0.117 mg/L | North East Out Fall |
| 2/2/2004 | Total Suspended Solids | 1,900 mg/L | 100 mg/L | North Central Out Fall |
| 2/2/2004 | Oil & Grease | 26 mg/L | 15 mg/L | North Central Out Fall |
| 2/2/2004 | Chemical Oxygen Demand | 140 mg/L | 120 mg/L | North Central Out Fall |
| 2/2/2004 | Aluminum | 13 mg/L | 0.75 mg/L | North Central Out Fall |
| 2/2/2004 | Copper | 0.11 mg/L | 0.0636 mg/L | North Central Out Fall |
| 2/2/2004 | Iron | 25 mg/L | 1.0 mg/L | North Central Out Fall |
| 2/2/2004 | Lead | 0.16 mg/L | 0.0816 mg/L | North Central Out Fall |
| 2/2/2004 | Zinc | 0.71 mg/L | 0.117 mg/L | North Central Out Fall |

Notice of Violation and Intent to File Suit

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 8 of 17

| 2/2/2004 | Total Suspended Solids | 680 mg/L | 100 mg/L | North East Out Fall |
|----------|------------------------|----------|----------|---------------------|
| 2/2/2004 | Specific Conductivity | 340 µmho/cm | 200 µmho/cm (proposed) | North East Out Fall |
| 2/2/2004 | Aluminum | 24 mg/L | 0.75 mg/L | North East Out Fall |
| 2/2/2004 | Copper | 0.16 mg/L | 0.0636 mg/L | North East Out Fall |
| 2/2/2004 | Iron | 40 mg/L | 1.0 mg/L | North East Out Fall |
| 2/2/2004 | Lead | 0.17 mg/L | 0.0816 mg/L | North East Out Fall |
| 2/2/2004 | Zinc | 0.95 mg/L | 0.117 mg/L | North East Out Fall |

CSPA's investigation, including its review of Davis Street Station's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of applicable water quality standards, EPA's benchmark values and the State Board's proposed benchmark for electrical conductivity, indicates that Davis Street Station has not implemented BAT and BCT at the Facility for its discharges of TSS, specific conductivity, O&G, COD, aluminum, copper, iron, lead, zinc and other pollutants, in violation of Effluent Limitation B(3) of the General Permit. Davis Street Station was required to have implemented BAT and BCT by no later than October 1, 1992. Thus, Davis Street Station is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT. In addition, the above numbers indicate that the facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit. CSPA alleges that such violations also have occurred and will occur on other rain dates, including every significant rain event that has occurred since April 16, 2003, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Davis Street Station has discharged storm water containing impermissible levels of TSS, specific conductivity, O&G, COD, aluminum, copper, iron, lead, zinc in violation of Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing any of these pollutants constitutes a separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Davis Street Station is subject to penalties for violations of the General Permit and the Act since April 16, 2003.

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 9 of 17

### B.   Failure to Identify and Control Non-Storm Water Discharges

The General Permit requires that facility operators "investigate the facility to identify all non-storm water discharges and their sources.  As part of this investigation, all drains (inlets and outlets) shall be evaluated to identify whether they connect to the storm drain system.  All non-storm water discharges shall be described.  This shall include the source, quantity, frequency, and characteristics of the non-storm water discharges and associated drainage area."  Section A(6)(a)(v).

The General Permit authorizes certain non-storm water discharges providing that the non-storm water discharges are in compliance with Regional Board requirements; that the non-storm water discharges are in compliance with local agency ordinances and/or requirements; that BMPs are included in the SWPPP to (1) prevent or reduce the contact of non-storm water discharges with significant materials or equipment and (2) minimize, to the extent practicable, the flow or volume of non-storm water discharges; that the non-storm water discharges do not contain significant quantities of pollutants; and that the monitoring program includes quarterly visual observations of each non-storm water discharge and its sources to ensure that BMPs are being implemented and are effective (Special Conditions D).  Section B(3) of the General Permit requires dischargers to conduct visual observations of all drainage areas for the presence of non-storm water discharges, to observe the non-storm water discharges, and maintain records of such observations.

CSPA, on information and belief, alleges that the Facility discharges unauthorized non-storm water at the Facility, including dust suppression water and wash water.  On information and belief, CSPA further alleges that the Facility has failed to identify and control non-storm water discharges in violation of Sections A(6)(a)(v) and B(3) and D of the General Permit. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Davis Street Station is subject to penalties for violations of the General Permit and the Act since April 16, 2003.

### C.   Failure to Prepare, Implement, Review and Update an Adequate Storm Water Pollution Prevention Plan.

Section A and Provision E(2) of the General Industrial Storm Water Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the General Permit to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 10 of 17

("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).

CSPA's investigation of the conditions at the Facility as well as Davis Street Station's Annual Reports indicate that Davis Street Station has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Davis Street Station has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Davis Street Station has been in continuous violation of Section A and Provision E(2) of the General Permit every day since April 16, 2003 at the very latest, and will continue to be in violation every day that Davis Street Station fails to prepare, implement, review, and update an effective SWPPP. Davis Street Station is subject to penalties for violations of the Order and the Act occurring since April 16, 2003.

> **D.     Failure to Develop and Implement an Adequate Monitoring and Reporting Program**

Section B of the General Permit describes the monitoring requirements for storm water and non-storm water discharges. Facilities are required to make monthly visual observations of storm water discharges (Section B(4)) and quarterly visual observations of both unauthorized and authorized non-storm water discharges (Section B(3)). Section B(5) requires facility operators to sample and analyze at least two storm water discharges from all storm water discharge locations during each wet season. Section B(7) requires that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 11 of 17

The above referenced data was obtained from the Facility's monitoring program as reported in its Annual Reports submitted to the Regional Board.  This data is evidence that the Facility has violated various Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations in the General Permit.  In addition, the Facility failed to sample or monitor any storm water discharge locations during the 2006-2007 and 2004-2005 rainy seasons based on a general claim that no qualifying events occurred at the Facility.  To the extent the storm water data collected by Davis Transfer Station is not representative of the quality of the Facility's various storm water discharges or the Facility failed to monitor all qualifying storm water discharges, CSPA, on information and belief, alleges that the Facility's monitoring program violates Sections B(3), (4), (5) and (7) of the General Permit.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Davis Street Station is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since April 16, 2003.

> ### E.    *Failure to File True and Correct Annual Reports.*

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board.  The Annual Report must be signed and certified by an appropriate corporate officer.  General Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit.  *See also* General Permit, Sections C(9) and (10) and B(14).

For the last five years, Davis Street Station and its agent, Jack Isola, inaccurately certified in their Annual Reports that the facility was in compliance with the General Permit.  Consequently, Davis Street Station has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time Davis Street Station failed to submit a complete or correct report and every time Davis Street Station or its agents falsely purported to comply with the Act.  Davis Street Station is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since April 16, 2003.

## IV.    **Persons Responsible for the Violations.**

CSPA puts Waste Management of Alameda County, Inc., Waste Management of California, Inc., Jack Isola, and Stuart Clark on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Waste Management of Alameda County, Inc., Waste Management of California, Inc., Jack Isola, and Stuart Clark on notice that it intends to include those persons in this action.

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 12 of 17

**V.      Name and Address of Noticing Party.**

Our name, address and telephone number is as follows:

Bill Jennings, Executive Director;
California Sportfishing Protection Alliance,
3536 Rainier Avenue,
Stockton, CA 95204
Tel. (209) 464-5067

**VI.     Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Michael R. Lozeau                         Andrew L. Packard
Douglas J. Chermak                       Law Offices of Andrew L. Packard
Law Office of Michael R. Lozeau    319 Pleasant Street
1516 Oak Street, Suite 216              Petaluma, California 94952
Alameda, California 94501               Tel. (707) 763-7227
Tel. (510) 749-9102                          andrew@packardlawoffices.com
mrlozeau@lozeaulaw.com

**VII.    Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Davis Street Station to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Davis Street Station and its agents for the above-referenced violations upon the expiration of the 60-day notice period.  However, during the 60-day notice period, we would be willing to discuss effective remedies for the violations noted in this letter.  If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within the next 20 days

so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance


cc:     CT Corporation, Agent of Service of Process for Waste Management of Alameda
        County, Inc. (C0091817) and Waste Management of California, Inc. (C0266196)

Notice of Violation and Intent to File Suit

## SERVICE LIST

Steve Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Michael Mukasey, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Wayne Nastri, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Bruce H. Wolfe, Executive Officer II
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

**ATTACHMENT A**

Rain Dates, Davis Street Station, San Leandro, California

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| April | 16 | 2003 | January | 02 | 2004 | November | 09 | 2004 |
| April | 21 | 2003 | January | 06 | 2004 | November | 10 | 2004 |
| April | 22 | 2003 | January | 08 | 2004 | November | 11 | 2004 |
| April | 24 | 2003 | January | 08 | 2004 | November | 13 | 2004 |
| April | 25 | 2003 | January | 09 | 2004 | November | 27 | 2004 |
| April | 27 | 2003 | January | 14 | 2004 | December | 06 | 2004 |
| April | 28 | 2003 | January | 23 | 2004 | December | 07 | 2004 |
| April | 29 | 2003 | January | 24 | 2004 | December | 08 | 2004 |
| May | 02 | 2003 | January | 26 | 2004 | December | 10 | 2004 |
| May | 03 | 2003 | January | 27 | 2004 | December | 26 | 2004 |
| May | 06 | 2003 | January | 30 | 2004 | December | 27 | 2004 |
| May | 07 | 2003 | February | 01 | 2004 | December | 28 | 2004 |
| May | 08 | 2003 | February | 02 | 2004 | December | 29 | 2004 |
| May | 30 | 2003 | February | 03 | 2004 | December | 30 | 2004 |
| July | 24 | 2003 | February | 06 | 2004 | December | 31 | 2004 |
| September | 03 | 2003 | February | 13 | 2004 | January | 01 | 2005 |
| November | 02 | 2003 | February | 15 | 2004 | January | 02 | 2005 |
| November | 03 | 2003 | February | 16 | 2004 | January | 03 | 2005 |
| November | 06 | 2003 | February | 17 | 2004 | January | 04 | 2005 |
| November | 07 | 2003 | February | 18 | 2004 | January | 05 | 2005 |
| November | 08 | 2003 | February | 20 | 2004 | January | 06 | 2005 |
| November | 09 | 2003 | February | 21 | 2004 | January | 07 | 2005 |
| November | 14 | 2003 | February | 22 | 2004 | January | 08 | 2005 |
| November | 15 | 2003 | February | 24 | 2004 | January | 09 | 2005 |
| November | 17 | 2003 | February | 25 | 2004 | January | 10 | 2005 |
| November | 30 | 2003 | February | 26 | 2004 | January | 11 | 2005 |
| December | 01 | 2003 | February | 27 | 2004 | January | 12 | 2005 |
| December | 02 | 2003 | March | 01 | 2004 | January | 13 | 2005 |
| December | 04 | 2003 | March | 25 | 2004 | January | 16 | 2005 |
| December | 05 | 2003 | March | 27 | 2004 | January | 17 | 2005 |
| December | 06 | 2003 | April | 18 | 2004 | January | 18 | 2005 |
| December | 07 | 2003 | April | 19 | 2004 | January | 19 | 2005 |
| December | 09 | 2003 | April | 20 | 2004 | January | 20 | 2005 |
| December | 10 | 2003 | April | 21 | 2004 | January | 21 | 2005 |
| December | 12 | 2003 | May | 28 | 2004 | January | 22 | 2005 |
| December | 13 | 2003 | August | 23 | 2004 | January | 23 | 2005 |
| December | 14 | 2003 | August | 24 | 2004 | January | 24 | 2005 |
| December | 19 | 2003 | September | 19 | 2004 | January | 25 | 2005 |
| December | 20 | 2003 | October | 17 | 2004 | January | 26 | 2005 |
| December | 21 | 2003 | October | 19 | 2004 | January | 27 | 2005 |
| December | 23 | 2003 | October | 20 | 2004 | January | 28 | 2005 |
| December | 24 | 2003 | October | 23 | 2004 | February | 07 | 2005 |
| December | 25 | 2003 | October | 25 | 2004 | February | 11 | 2005 |
| December | 28 | 2003 | October | 26 | 2004 | February | 14 | 2005 |
| December | 29 | 2003 | November | 03 | 2004 | February | 15 | 2005 |
| January | 01 | 2004 | November | 04 | 2004 | February | 16 | 2005 |

**ATTACHMENT A**
Rain Dates, Davis Street Station, San Leandro, California

| Month | Day | Year | Month | Day | Year | Month | Day | Year |
|---|---|---|---|---|---|---|---|---|
| February | 17 | 2005 | November | 04 | 2005 | March | 21 | 2006 |
| February | 18 | 2005 | November | 07 | 2005 | March | 11 | 2006 |
| February | 19 | 2005 | November | 08 | 2005 | March | 13 | 2006 |
| February | 20 | 2005 | November | 09 | 2005 | March | 30 | 2006 |
| February | 21 | 2005 | November | 25 | 2005 | March | 04 | 2006 |
| February | 26 | 2005 | November | 28 | 2005 | March | 10 | 2006 |
| February | 27 | 2005 | November | 29 | 2005 | March | 28 | 2006 |
| February | 28 | 2005 | December | 01 | 2005 | March | 07 | 2006 |
| March | 01 | 2005 | December | 02 | 2005 | March | 01 | 2006 |
| March | 02 | 2005 | December | 07 | 2005 | March | 02 | 2006 |
| March | 03 | 2005 | December | 17 | 2005 | March | 09 | 2006 |
| March | 04 | 2005 | December | 18 | 2005 | March | 27 | 2006 |
| March | 09 | 2005 | December | 19 | 2005 | March | 12 | 2006 |
| March | 18 | 2005 | December | 20 | 2005 | March | 03 | 2006 |
| March | 19 | 2005 | December | 21 | 2005 | March | 16 | 2006 |
| March | 20 | 2005 | December | 22 | 2005 | March | 31 | 2006 |
| March | 21 | 2005 | December | 25 | 2005 | March | 06 | 2006 |
| March | 22 | 2005 | December | 26 | 2005 | March | 24 | 2006 |
| March | 23 | 2005 | December | 27 | 2005 | March | 14 | 2006 |
| March | 27 | 2005 | December | 28 | 2005 | March | 20 | 2006 |
| March | 28 | 2005 | December | 29 | 2005 | March | 25 | 2006 |
| March | 29 | 2005 | December | 30 | 2005 | March | 05 | 2006 |
| April | 03 | 2005 | December | 31 | 2005 | April | 01 | 2006 |
| April | 04 | 2005 | January | 06 | 2006 | April | 17 | 2006 |
| April | 07 | 2005 | January | 08 | 2006 | April | 15 | 2006 |
| April | 08 | 2005 | January | 13 | 2006 | April | 08 | 2006 |
| April | 22 | 2005 | January | 21 | 2006 | April | 10 | 2006 |
| April | 23 | 2005 | January | 03 | 2006 | April | 09 | 2006 |
| April | 27 | 2005 | January | 18 | 2006 | April | 05 | 2006 |
| April | 28 | 2005 | January | 11 | 2006 | April | 03 | 2006 |
| April | 29 | 2005 | January | 27 | 2006 | April | 07 | 2006 |
| May | 04 | 2005 | January | 07 | 2006 | April | 04 | 2006 |
| May | 05 | 2005 | January | 01 | 2006 | April | 12 | 2006 |
| May | 08 | 2005 | January | 17 | 2006 | April | 02 | 2006 |
| May | 09 | 2005 | January | 30 | 2006 | April | 11 | 2006 |
| May | 18 | 2005 | January | 28 | 2006 | April | 16 | 2006 |
| May | 19 | 2005 | January | 02 | 2006 | May | 24 | 2006 |
| June | 8 | 2005 | January | 14 | 2006 | May | 19 | 2006 |
| June | 09 | 2005 | February | 17 | 2006 | May | 21 | 2006 |
| June | 16 | 2005 | February | 04 | 2006 | June | 28 | 2006 |
| June | 17 | 2005 | February | 02 | 2006 | July | 20 | 2006 |
| June | 18 | 2005 | February | 26 | 2006 | July | 06 | 2006 |
| October | 14 | 2005 | February | 01 | 2006 | July | 21 | 2006 |
| October | 15 | 2005 | February | 27 | 2006 | August | 02 | 2006 |
| October | 26 | 2005 | February | 28 | 2006 | October | 05 | 2006 |
| October | 29 | 2005 | March | 29 | 2006 | October | 06 | 2006 |
| November | 03 | 2005 | March | 17 | 2006 | October | 17 | 2006 |

**ATTACHMENT A**

Rain Dates, Davis Street Station, San Leandro, California

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| November | 02 | 2006 | April | 14 | 2007 | December | 06 | 2007 |
| November | 03 | 2006 | April | 19 | 2007 | December | 07 | 2007 |
| November | 04 | 2006 | April | 20 | 2007 | December | 17 | 2007 |
| November | 09 | 2006 | April | 21 | 2007 | December | 18 | 2007 |
| November | 11 | 2006 | April | 22 | 2007 | December | 19 | 2007 |
| November | 12 | 2006 | April | 27 | 2007 | December | 20 | 2007 |
| November | 13 | 2006 | May | 02 | 2007 | December | 27 | 2007 |
| November | 14 | 2006 | May | 03 | 2007 | December | 28 | 2007 |
| November | 15 | 2006 | May | 04 | 2007 | December | 29 | 2007 |
| November | 23 | 2006 | May | 10 | 2007 | January | 03 | 2008 |
| November | 27 | 2006 | May | 11 | 2007 | January | 04 | 2008 |
| November | 28 | 2006 | May | 14 | 2007 | January | 05 | 2008 |
| December | 09 | 2006 | May | 15 | 2007 | January | 06 | 2008 |
| December | 10 | 2006 | May | 16 | 2007 | January | 07 | 2008 |
| December | 11 | 2006 | May | 17 | 2007 | January | 08 | 2008 |
| December | 12 | 2006 | May | 20 | 2007 | January | 09 | 2008 |
| December | 13 | 2006 | May | 21 | 2007 | January | 10 | 2008 |
| December | 14 | 2006 | May | 23 | 2007 | January | 21 | 2008 |
| December | 15 | 2006 | May | 24 | 2007 | January | 22 | 2008 |
| December | 16 | 2006 | May | 27 | 2007 | January | 23 | 2008 |
| December | 22 | 2006 | May | 29 | 2007 | January | 24 | 2008 |
| December | 27 | 2006 | May | 30 | 2007 | January | 25 | 2008 |
| January | 04 | 2007 | May | 31 | 2007 | January | 26 | 2008 |
| January | 05 | 2007 | June | 01 | 2007 | January | 27 | 2008 |
| January | 17 | 2007 | June | 03 | 2007 | January | 28 | 2008 |
| January | 26 | 2007 | June | 04 | 2007 | January | 29 | 2008 |
| January | 27 | 2007 | June | 06 | 2007 | January | 30 | 2008 |
| January | 28 | 2007 | June | 08 | 2007 | January | 31 | 2008 |
| February | 07 | 2007 | June | 10 | 2007 | February | 02 | 2008 |
| February | 08 | 2007 | June | 13 | 2007 | February | 03 | 2008 |
| February | 09 | 2007 | June | 14 | 2007 | February | 19 | 2008 |
| February | 10 | 2007 | June | 15 | 2007 | February | 20 | 2008 |
| February | 11 | 2007 | June | 19 | 2007 | February | 21 | 2008 |
| February | 12 | 2007 | June | 21 | 2007 | February | 22 | 2008 |
| February | 21 | 2007 | June | 22 | 2007 | February | 23 | 2008 |
| February | 22 | 2007 | September | 22 | 2007 | February | 24 | 2008 |
| February | 23 | 2007 | October | 09 | 2007 | March | 13 | 2008 |
| February | 24 | 2007 | October | 10 | 2007 | March | 14 | 2008 |
| February | 25 | 2007 | October | 12 | 2007 | March | 15 | 2008 |
| February | 26 | 2007 | October | 15 | 2007 | March | 28 | 2008 |
| February | 27 | 2007 | October | 16 | 2007 | March | 29 | 2008 |
| February | 28 | 2007 | October | 17 | 2007 | | | |
| March | 20 | 2007 | October | 19 | 2007 | | | |
| March | 26 | 2007 | November | 05 | 2007 | | | |
| April | 07 | 2007 | November | 10 | 2007 | | | |
| April | 09 | 2007 | November | 11 | 2007 | | | |
| April | 11 | 2007 | December | 04 | 2007 | | | |