Michael R. Lozeau (SBN 142893)
Douglas J. Chermak (SBN 233382)
Lozeau Drury LLP
1516 Oak Street, Suite 216
Alameda, CA 94501
Telephone:     510 749 9102
Facsimile:     510 749 9103
Email:         michael@lozeaudrury.com
               doug@lozeaudrury.com

Andrew L. Packard (SBN 168690)
Michael P. Lynes (SBN 230462)
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA 94952
Telephone:     707 763 7227
Facsimile:     415 763 9227
Email:         andrew@packardlawoffices.com

Attorneys for Plaintiff
California Sportfishing Protection Alliance


John Lynn Smith (SBN 154657)
Email:  jlsmith@reedsmith.com
Julia C. Butler (SBN 199133)
Email:  jbutler@reedsmith.com
REED SMITH LLP
1999 Harrison Street, Suite 2400
Oakland, CA 94612-3572
**Mailing Address:**
P.O. Box 2084
Oakland, CA 94604-2084

Telephone:     +1 510 763 2000
Facsimile:     +1 510 273 8832

Attorneys for Defendant
Waste Management Of Alameda County, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, <br><br> Plaintiff, <br><br> vs. <br><br> WASTE MANAGEMENT OF ALAMEDA COUNTY, INC., <br><br> Defendant. | No.: 008-03497 <br><br> **CONSENT DECREE** <br><br> Honorable Samuel Conti |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## A.    BACKGROUND

1.    California Sportfishing Protection Alliance ("CSPA") is a 501(c)(3) non-profit, public benefit corporation organized under the laws of the State of California, dedicated to the protection, enhancement, and restoration of the San Francisco Bay and other California waters.  Bill Jennings is the Chairperson of CSPA and a member of CSPA.

2.    Waste Management of Alameda County, Inc. ("WMAC") is a corporation organized under the laws of the State of California that owns and operates a transfer station for commercial and municipal solid waste at 2615 Davis Street in San Leandro, California (the "Facility") pursuant to State Water Resources Control Board Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System General Permit No. CAS000001, Waste Discharge Requirements for Discharges of Storm Water Associated with Industrial Activities Excluding Construction Activities (hereinafter, the "General Permit").  A map of the Facility is attached hereto as Exhibit A and incorporated by reference.  CSPA and WMAC shall be referred to herein collectively as the "Parties" and each individually as a "Party."

3.    On April 21, 2008, CSPA provided WMAC with a Notice of Violation and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal Water Pollution Control Act (the "Act" or "Clean Water Act"), 33 U.S.C. § 1365.

4.    On July 21, 2008, CSPA filed its Complaint in the United States District Court for the Northern District of California against WMAC (California Sportfishing Protection Alliance v. Waste Management of Alameda County, Inc., Case No. 3:08-cv-03497-SC).  A true and correct copy of the Complaint, including the 60-Day Notice Letter, is attached hereto as Exhibit B and incorporated by reference.

5.    WMAC denies any and all of CSPA's claims in its 60-Day Notice Letter and

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    Complaint.

2

3        6.      CSPA and WMAC, through their authorized representatives and without either

4    adjudication of CSPA's claims or admission by WMAC of any alleged violation or other

5    wrongdoing, have chosen to resolve in full CSPA's allegations in the 60-Day Notice Letter and

6    Complaint through settlement and avoid the cost and uncertainties of further litigation.

7

8        7.      The Parties wish to compromise, resolve, settle, and terminate any and all disputes or

9    claims between them as to the allegations set forth in the 60-Day Notice Letter and Complaint and as

10   a result consent to the entry of this Consent Decree and Order without trial of any issues and

11   stipulate that in order to settle the Claims, this Consent Decree and order should be entered.  This

12   Consent Decree constitutes a settlement of disputed claims.  It is not an admission of jurisdiction

13   over or liability for the allegations set forth in the 60-Day Notice Letter and Complaint or an

14   admission of any fact.  Should this proposed Consent Decree fail to be entered for any reason, this

15   proposed Consent Decree, and any statement or other provision contained in this proposed Consent

16   Decree shall have no legal effect and shall not be used for any purpose in any subsequent proceeding

17   in this or any other litigation.

18

19       8.      The Parties agree, and this Court by entering this Consent Decree finds, that this

20   Consent Decree has been negotiated by the Parties in good faith, that settlement of this matter will

21   avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair,

22   reasonable, and in the public interest.

23

24       THEREFORE, with the consent of the Parties to this Consent Decree, it is ORDERED,

25   ADJUDGED AND DECREED:

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**B.     COURT'S AUTHORITY**

This Court has authority under the Clean Water Act, 33 U.S.C. § 1365 to enter and enforce this Consent Decree.

**C.     INJUNCTIVE RELIEF**

**1.     Effective Date.**

This Consent Decree shall be effective upon the date this Consent Decree is entered by the Court (the "Effective Date").  Pursuant to 33 U.S.C. § 1365(c)(3), the Court shall not enter this Consent Decree until 45 days after receipt of a copy of the proposed Consent Decree by the Attorney General and the Administrator of the U.S. Environmental Protection Agency.

**2.     Compliance with General Permit.**

WMAC agrees to operate the Facility in compliance with the applicable requirements of the General Permit and Clean Water Act.

**3.     Implemented Storm Water Controls**

WMAC shall maintain in good working order all storm water collection and treatment systems currently installed or to be installed pursuant to this Consent Decree, including but not limited to, existing housekeeping measures.

**4.     Additional Best Management Practices**

WMAC shall implement the following best management practices ("BMPs") to

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    improve the storm water pollution prevention measures at the drop inlets and outfalls at the Facility:

3           a.      Within TEN (10) calendar days after the Effective Date, WMAC shall improve the effectiveness of the straw wattles surrounding the drop inlets in the unpaved areas of the Facility by digging trenches for the wattles and anchoring the wattles into the ground.

7           b.      Within TEN (10) calendar days after the Effective Date, WMAC shall install catch basin filters or bag inserts on all drop inlets and catch basins at the Facility. WMAC shall use appropriate mesh sizing to catch finer grain materials. Each filter shall be replaced or maintained as needed.

12           c.      Within TEN (10) calendar days after the Effective Date, WMAC shall design removable metal covers for all drop inlets at the Facility to prevent the accumulation of dirt, leaves, sediment, and other similar materials. The covers shall be placed over all drop inlets on or before July 1st at the end of each rainy season, subsequent to appropriate maintenance of the filters described above. The covers shall be removed prior to the first rain event of the subsequent rainy season. The covers shall be fitted to prevent such materials from entering the drop inlets and designed such that the covers will remain firmly in place while there is normal activity at the Facility.

21           d.      Within TEN (10) calendar days after the Effective Date, WMAC shall install curbing and shall pave the road near Discharge Point #5 to prevent flows from discharging to the gully. By November 1, 2009, WMAC shall fill the gully in order to prevent flows from discharging through the gully near Discharge Point #5.

26           e.      WMAC shall take the following actions to upgrade the storm water treatment system at the Facility's outfalls and agrees that the treatment system shall be designed to handle up to a 15-year, 24-hour storm event.

(i)     By June 1, 2009, WMAC shall complete an engineering feasibility study to evaluate and select a long-term treatment alternative(s) for reducing total suspended solids ("TSS") and other storm water pollutants below the bench mark values.  This study will include an alternative to treat the storm water discharged at the Recycling Center outfall (Discharge Point #3).  The study will evaluate treatment systems designed to treat a 15-year, 24-hour storm event.

(ii)    By August 1, 2009, WMAC shall complete design plans and specifications for the selected alternative(s).

(iii)   By October 1, 2009, WMAC shall implement the selected alternative(s).

5.      **Increased Housekeeping Measures**

WMAC shall institute the following accelerated cleaning schedule at the Facility:

a.      WMAC will make the following improvements to its sweeping program:

(i)     Within TEN (10) calendar days after the Effective Date, WMAC shall update the sweeping maps from the Facility and include a copy of the maps in the Facility's Storm Water Pollution Prevention Plan ("SWPPP").

(ii)    Beginning TEN (10) calendar days after the Effective Date, WMAC shall conduct mechanical sweeping of the entire Facility each weekday (excluding holidays).

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

(iii)   All sweeping activities performed at the Facility shall be recorded in a sweeping log.  A sample blank log form will be included in the Facility's Annual Report and the Storm Water Pollution Prevention Plan.

(iv)   Within TEN (10) calendar days after the Effective Date, WMAC shall institute a training program for the sweeper operators with an evaluation component.

(v)   Within THIRTY (30) calendar days after the Effective Date, WMAC shall complete an evaluation of sweepers, including regenerative sweepers, to determine which sweeper type is best suited for the Facility.

(vi)   Within SIXTY (60) calendar days after the completion of the sweeper evaluation described in the preceding subsection and only if a new sweeper is identified as appropriate, WMAC shall acquire and begin using the new sweeper.

(vii)   At the end of the 2008-2009 rainy season, in the written memorandum described below in Section C.8, WMAC shall evaluate the feasibility of installing a GPS unit into the sweeper with a visual display recording the sweeper path to ensure that the entire Facility is swept each day.

b.   Within THIRTY (30) calendar days after the Effective Date, WMAC shall implement a program for cleaning out the drop inlet filters, including weekly cleanouts during the rainy season.  WMAC shall monitor the filters for damage and replace as necessary.

c.   Within TEN (10) calendar days after the Effective Date, WMAC shall institute appropriate BMPs to avoid storm drains when spraying water for dust control.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1      **6.      Monitoring**

2

3           WMAC agrees to perform the monitoring described herein during the 2008-2009,

4    2009-2010, and 2010-2011 rainy seasons in addition to the minimum monitoring requirements of the

5    General Permit.

6

7           a.      WMAC shall monitor all storm water discharge locations.  For each discharge

8    location, monitoring samples shall be collected at a point downstream from any management

9    measures and treatment systems.  Monitoring shall be performed consistent with the monitoring

10   requirements of the General Permit.

11

12          b.      During the 2008-2009 and 2009-2010 rainy seasons, WMAC shall sample and

13   analyze storm water discharges from four (4) qualifying storm events that result in discharge

14   consistent with the requirements and protocols set forth in the General Permit.  During the 2010-

15   2011 rainy season, WMAC shall sample and analyze storm water discharges from three (3)

16   qualifying storm events that result in discharge consistent with the requirements and protocols set

17   forth in the General Permit.

18

19          c.      WMAC shall analyze each storm water sample taken in accordance with the

20   General Permit and this Consent Decree for, at a minimum, TSS, pH, oil and grease or total organic

21   carbon, electrical conductivity, chemical oxygen demand, iron, zinc, copper, aluminum, lead, and

22   nitrate plus nitrite as nitrogen (N+N).  (WMAC shall not be required to sample for N+N if WMAC

23   and its analytical laboratory cannot meet the required 48-hour holding time for analysis.  Generally,

24   samples taken on a weekday, but prior to 2:00 p.m. on Thursday, can meet the required holding

25   times.)  WMAC may eliminate one or more of these pollutants from future sampling analysis if

26   allowed by Section B.5.c. of the General Permit.

27

28          d.      WMAC shall conduct monthly visual observations of Discharge Points 2, 3, 4,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   and 5 for at least one qualifying rain event per month (unless no such qualifying event occurs) that

2   results in any discharge from the Facility.  Monitoring of Discharge Points 4 and 5 will only be

3   performed if the discharge points are visible.  WMAC shall maintain a written log describing these

4   observations.

5

6       **7.      Monitoring Results**

7

8          Results from WMAC's sampling and analysis during the term of this Consent Decree

9   shall be provided to CSPA within 30 calendar days of receipt of the sampling results by WMAC or

10  its counsel.

11

12      **8.      Meet and Confer Regarding Exceedance of Levels of Potential Concern**

13

14          If analytical results of storm water samples taken by WMAC during the 2008-2009,

15  2009-2010, or the 2010-2011 rainy seasons indicate that storm water discharges from the Facility

16  exceed the following levels of potential concern –  Total Suspended Solids: 100 mg/L; Specific

17  Conductance: 200 μmhos/cm;  Oil & Grease: 15 mg/L or Total Organic Carbon: 120 mg/L; pH: 6.0-

18  9.0 s.u.; Aluminum: 0.75 mg/L; Zinc: 0.117 mg/L; Iron: 1.0 mg/L; Copper: 0.0636 mg/L; Lead:

19  0.0816 mg/L; Chemical Oxygen Demand: 120 mg/L; and Nitrate + Nitrite as Nitrogen:  0.68 mg/L.

20  WMAC agrees to take additional feasible measures aimed at reducing pollutants in the Facility's

21  storm water to levels at or below these levels.

22

23          In furtherance of that objective, WMAC shall prepare a written statement

24  ("Memorandum") discussing:

25

26          a.      any exceedance or exceedances;

27

28          b.      an explanation of the possible cause(s) and/or source(s) of any exceedance;

1   and

2

3          c.       additional feasible best management practices, if any, that will be taken to

4   further reduce the possibility of future exceedance(s).

5

6          Such Memorandum shall be e-mailed and sent via first class mail to CSPA not later

7   than July 15th following the conclusion of each rainy season.

8

9          Any additional measures set forth in the Memorandum shall be implemented as soon

10  as practicable, but not later than 21 calendar days from the due date of the Memorandum, except

11  where 1) structural changes require longer than 21 calendar days to complete; 2) weather-related

12  conditions render immediate implementation infeasible; or 3) the Parties agree in writing to defer

13  implementation of specific measures in order to effectively meet and confer in accordance with

14  Section C.8.  Within thirty (30) calendar days of implementation, WMAC's SWPPP shall be

15  amended to include all additional BMP measures designated in the Memorandum.

16

17         Upon receipt of the Memorandum, CSPA may review and comment on any additional

18  measures.  If requested by CSPA within 21 days of receipt of such Memorandum, CSPA and

19  WMAC shall meet and confer and conduct a site inspection within 60 days after the due date of the

20  Memorandum to discuss the contents of the Memorandum and the adequacy of proposed measures

21  to improve the quality of the Facility's storm water to levels at or below the Levels of Potential

22  Concern.  If within 21 days of the parties meeting and conferring, the Parties do not agree on the

23  adequacy of the additional measures set forth in the Memorandum, the Parties may agree to seek a

24  settlement conference with the Judge assigned to this action pursuant to Section J.2 below.  If the

25  Parties fail to reach agreement on additional measures, CSPA may bring a motion before the Judge

26  consistent with Section J.2 below.  If CSPA does not request a meet and confer regarding the

27  Memorandum within the 21 day comment period provided for in this paragraph, CSPA shall waive

28  any right to object to such Memorandum pursuant to this Consent Decree.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Any concurrence or failure to object by CSPA with regard to the reasonableness of any additional measures implemented by WMAC shall not be deemed to be an admission of the adequacy of such measures should they fail to bring the Facility's storm water into compliance with applicable water quality criteria.

In addition to any site inspections conducted as part of meeting and conferring on additional measures set forth above, WMAC shall permit representatives of CSPA to perform one (1) additional site visit to the Facility per year during normal daylight business hours during the term of this Consent Decree; provided that CSPA provides WMAC via e-mail with at least one week prior written notice.

**9.     Provision of Documents and Reports**

During the life of this Consent Decree, WMAC shall provide CSPA with a copy of all documents submitted to the Regional Board or the State Water Resources Control Board ("State Board") concerning the Facility's storm water discharges, including but not limited to all documents and reports submitted to the Regional Board and/or State Board as required by the General Permit. Such documents and reports shall be mailed to CSPA contemporaneously with submission to such agency. WMAC also shall provide CSPA a copy of all documents referenced in this agreement, including but not limited to logs, photographs, or analyses, within seven (7) calendar days of a written request (via e-mail or regular mail) by CSPA.

**10.     Amendment of SWPPP**

Within sixty (60) calendar days of the Effective Date of this Consent Decree, WMAC shall amend the Facility's Storm Water Pollution Prevention Plan ("SWPPP") to incorporate all changes, improvements, sample log forms, and best management practices set forth in or resulting from this Consent Decree. WMAC shall amend the SWPPP to reflect that water used on material for

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    dust-control is not an authorized non-storm water discharge and that such spraying should seek to

2    avoid all storm drains.  In addition, the Facility shall amend the maps in the SWPPP to clearly

3    delineate the Facility boundaries, direction of storm water flow and runoff within each drainage area,

4    indicate all drop inlet locations and which inlets go to the sanitary sewer and which are now defunct

5    or blocked, identify all areas of soil erosion, and indicate location of non-storm water discharge

6    points.  The Facility shall ensure that all maps, tables, and text comply with the requirements of the

7    General Permit.  A copy of the amended SWPPP shall be provided to CSPA within thirty (30)

8    calendar days of completion.

9

10   **D.    MITIGATION PAYMENT**

11

12           In recognition of the good-faith efforts by WMAC to comply with all aspects of the

13   General Permit and the Clean Water Act, and in lieu of payment by WMAC of any penalties, which

14   may have been assessed in this action if it had proceeded to trial, WMAC agrees to pay the sum of

15   FIFTY THOUSAND DOLLARS ($50,000) to the Rose Foundation for Communities and the

16   Environment ("Rose Foundation") for the sole purpose of providing grants to environmentally

17   beneficial projects within the San Francisco Bay-Delta Estuary, relating to water quality

18   improvements in the area.  Payment shall be made by WMAC within THIRTY (30) calendar days of

19   the Effective Date.  Payment by WMAC shall be made in the form of a single check payable to the

20   "Rose Foundation."

21

22   **E.    ATTORNEY'S FEES AND COSTS; COMPLIANCE OVERSIGHT COSTS**

23

24           As reimbursement for CSPA's investigative, expert and attorneys' fees and costs,

25   WMAC shall pay CSPA the sum of THIRTY THOUSAND DOLLARS ($30,000).  Payment shall

26   be made by WMAC within THIRTY (30) calendar days of the Effective Date.  Payment by WMAC

27   to CSPA shall be made in the form of a single check payable to "Lozeau Drury LLP Attorney-Client

28   Trust Account," and shall constitute full payment for all costs of litigation, including investigative,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  expert and attorneys' fees and costs incurred by CSPA that have or could have been claimed in

2  connection with CSPA's claims, up to and including the Effective Date of this Consent Decree.

3

4       As reimbursement for CSPA's future costs that will be incurred in order for CSPA to

5  monitor WMAC's compliance with this Consent Decree and to effectively meet and confer and

6  evaluate monitoring results for the Facility, WMAC agrees to pay CSPA the amount of TEN

7  THOUSAND DOLLARS ($10,000) for costs to be incurred in overseeing the implementation of this

8  Consent Decree.  WMAC shall make payment to CSPA within THIRTY (30) calendar days after the

9  Effective Date.  Payment by WMAC to CSPA shall be made in the form of a check payable to

10  "Lozeau Drury LLP Attorney-Client Trust Account."

11

12  **F.**     **RELEASE OF CLAIMS; COVENANT NOT TO SUE**

13

14       In consideration of the above, and except as otherwise provided by this Consent

15  Decree, the Parties hereby forever and fully release each other and their respective successors,

16  assigns, officers, agents, employees, and all persons, firms and corporations having an interest in

17  them, from any and all claims and demands of any kind, nature, or description whatsoever, and from

18  any and all liabilities, damages, injuries, actions or causes of action, either at law or in equity, which

19  the Parties have against each other arising from CSPA's allegations and claims as set forth in the 60-

20  Day Notice Letter and Complaint up to and including the Termination Date of this Consent Decree.

21

22       The Parties acknowledge that they are familiar with section 1542 of the California

23  Civil Code, which provides:

24

25       A general release does not extend to claims which the creditor does not

26       know or suspect to exist in his or her favor at the time of executing the

27       release, which if known by him or her must have materially affected his or

28       her settlement with the debtor.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    The Parties hereby waive and relinquish any rights or benefits they may have under

2  California Civil Code section 1542 with respect to any other claims against each other arising from,

3  or related to, the allegations and claims as set forth in the 60-Day Notice Letter and Complaint up to

4  and including the Termination Date of this Consent Decree.

5

6    For the period beginning on the Effective Date and ending on December 15, 2011,

7  CSPA agrees that neither CSPA, its officers, executive staff, members of its governing board nor any

8  organization under the control of CSPA, its officers, executive staff, or members of its governing

9  board, will file any lawsuit against WMAC seeking relief for alleged violations of the Clean Water

10  Act or violations of the General Permit.  CSPA further agrees that, beginning on the Effective Date

11  and ending on December 15, 2011, CSPA will not support other lawsuits, by providing financial

12  assistance, personnel time or other affirmative actions, against WMAC that may be proposed by

13  other groups or individuals who would rely upon the citizen suit provision of the Clean Water Act to

14  challenge WMAC's compliance with the Clean Water Act or the General Permit.

15

16  **G.    NOTICE TO THE FEDERAL GOVERNMENT**

17

18    WMAC shall submit this Consent Decree to the U.S. EPA and the U.S. Department

19  of Justice (hereinafter, the "Agencies") via certified mail, return receipt requested, within five (5)

20  calendar days after filing of this Consent Decree with the Court for review consistent with 33 U.S.C.

21  § 1365(c)(3).  The Agencies' review period expires forty-five (45) calendar days after receipt of the

22  Consent Decree by both Agencies, as evidenced by the return receipts, copies of which shall be

23  provided to CSPA upon receipt by WMAC.

24

25  **H.    TERMINATION DATE OF CONSENT DECREE**

26

27    This Consent Decree shall terminate on December 15, 2011.

28

**I.      BREACH OF CONSENT DECREE; IMPOSSIBILITY OF PERFORMANCE**

Where implementation of the actions set forth in this Consent Decree, within the deadlines set forth in those paragraphs, becomes impossible, despite the timely good faith efforts of the Parties, the Party who is unable to comply shall notify the other in writing within seven (7) calendar days of the date that the failure becomes apparent, and shall describe the reason for the non-performance.  The Parties agree to meet and confer in good faith concerning the non-performance and, where the Parties concur that the non-performance was or is impossible, despite the timely good faith efforts of one of the Parties, new performance deadlines shall be established.  In the event that the Parties cannot timely agree upon the terms of such a stipulation, either of the Parties shall have the right to invoke the dispute resolution procedure described herein.

**J.      GENERAL PROVISIONS**

1.      <u>No Admission or Finding</u>.  Neither this Consent Decree nor any payment pursuant to the Consent Decree shall constitute evidence or be construed as a finding, adjudication, or acknowledgment of any fact, law or liability, nor shall it be construed as an admission of violation of any law, rule or regulation.  However, this Consent Decree and/or any payment pursuant to the Consent Decree may constitute evidence in actions seeking compliance with this Consent Decree.

2.      <u>Dispute Resolution Procedures</u>.  Except as specifically noted herein, any dispute with respect to any of the provisions of this Consent Decree shall be resolved through the following procedure.  The Parties agree to first meet and confer to resolve any dispute arising under this Consent Decree.  In the event that such disputes cannot be resolved through this meet and confer process, the Parties agree to request a settlement meeting before the Judge assigned to this action.  In the event that the Parties cannot resolve the dispute by the conclusion of the settlement meeting with the Judge, the Parties agree that either Party may submit the dispute via motion to the Judge.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

In resolving any dispute arising from this Consent Decree, the Judge shall have discretion to award attorneys' fees and costs to either Party.  The relevant provisions of the then-applicable Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure shall govern the allocation of fees and costs in connection with the resolution of any disputes before the Judge.  The Judge shall award relief limited to compliance orders and awards of attorneys' fees and costs, subject to proof. The Parties agree to file any waivers necessary for the Judge to preside over any settlement conference and motion practice.

3.     Construction.  The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined by law, in the General Permit, Clean Water Act or specifically herein.

4.     Choice of Law. This Consent Decree shall be governed by the laws of the United States, and where applicable, the laws of the State of California.

5.     Severability.  In the event that any provision, section, or sentence of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

6.     Correspondence.  All notices required herein or any other correspondence pertaining to this Consent Decree shall be sent by regular, certified, or overnight mail as follows:

If to CSPA:

Bill Jennings, Chairman
California Sportfishing Protection Alliance
3536 Rainier Road
Stockton, CA  95204
Tel: (209) 464-5067
deltakeep@aol.com

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1

And to:

2

3

Michael R. Lozeau
Lozeau Drury LLP
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel:  (510) 749-9102
michael@lozeaudrury.com

4

5

6

7

8

If to WMAC:

9

10

Waste Management of Alameda County, Inc.
Attention: District Manager
Davis Street Transfer Station
2615 Davis Street
San Leandro, California 94577

11

12

13

And to:

14

15

John Lynn Smith
Reed Smith LLP
1999 Harrison Street
Suite 2200
Oakland, CA 94612
Tel: (510) 466-6778
jlsmith@reedsmith.com

16

17

18

19

Notifications of communications shall be deemed submitted on the date that they are

20

e-mailed, postmarked and sent by first-class mail or deposited with an overnight mail/delivery

21

service.  Any change of address or addresses shall be communicated in the manner described above

22

for giving notices.

23

24

7.    Counterparts.  This Consent Decree may be executed in any number of

25

counterparts, all of which together shall constitute one original document.  Telecopied, scanned

26

(.pdf), and/or facsimiled copies of original signature shall be deemed to be originally executed

27

counterparts of this Consent Decree.

28

8.      <u>Assignment</u>.  Subject only to the express restrictions contained in this Consent Decree, all of the rights, duties and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the Parties, and their successors and assigns.

9.      <u>Modification of the Agreement</u>.  This Consent Decree, and any provisions herein, may not be changed, waived, discharged or terminated unless by a written instrument, signed by the Parties.

10.     <u>Full Settlement</u>.  This Consent Decree constitutes a full and final settlement of this matter.  It is expressly understood and agreed that the Consent Decree has been freely and voluntarily entered into by the Parties with and upon advice of counsel.

11.     <u>Integration Clause</u>.  This is an integrated Consent Decree.  This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Parties and expressly supersedes any and all prior oral or written agreements covenants, representations and warranties (express or implied) concerning the subject matter of this Consent Decree.

12.     <u>Authority</u>.  The undersigned representatives for CSPA and WMAC each certify that he/she is fully authorized by the Party whom he/she represents to enter into the terms and conditions of this Consent Decree.

## K.     RETENTION OF JURISDICTION

Subject to the provisions of this Consent Decree, this Court shall retain jurisdiction to enforce the terms and conditions of this Consent Decree.  This Consent Decree shall terminate after all terms and conditions specified within this Consent Decree have been satisfied.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

SO AGREED AND STIPULATED:

Dated: 5 February 2009

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

By _Bill Jennings_ Executive Director
(Title)

Dated: 11 February, 2009

WASTE MANAGEMENT OF ALAMEDA COUNTY, INC.

By _____ 2/11/09
(Title)
ASSISTANT SECRETARY

APPROVED AS TO FORM:

LOZEAU DRURY LLP

_____ 2/5/2009
Michael R. Lozeau
Attorneys for Plaintiff

REED SMITH LLP

_____
John Lynn Smith
Attorneys for Defendant

IT IS SO ORDERED.

Dated and entered into on _____ April 21, 2009

_____
UNITED STATES DISTRICT JUDGE

US_ACTIVE-101130775.1

- 19 -
Consent Decree

Case No. 008-03497

# EXHIBIT A



**SITE PLAN**

2615 DAVIS STREET
SAN LEANDRO, CA

# EXHIBIT B

MICHAEL R. LOZEAU (State Bar No. 142893)
DOUGLAS J. CHERMAK (State Bar No. 233382)
Lozeau Drury LLP
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel: (510) 749-9102
Fax: (510) 749-9103 (fax)
E-mail: michael@lozeaudrury.com
        doug@lozeaudrury.com

ANDREW L. PACKARD (State Bar No. 168690)
MICHAEL P. LYNES (State Bar No. 230462)
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (415) 763-9227
E-mail: andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

ORIGINAL
FILED

JUL 2 1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SC**

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>        Plaintiff,<br><br>vs.<br><br>WASTE MANAGEMENT OF ALAMEDA COUNTY, INC., a corporation.<br><br>        Defendant. | Case No. 08-03497<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, by and through its

counsel, hereby alleges:

I.   **INTRODUCTION**

    1.     This complaint seeks relief for Defendant's discharges of polluted storm water

and non-storm water pollutants from Defendant's facility ("the Facility") into the waters of

the United States in violation of the Act and the State of California's "Waste Discharge

COMPLAINT

1   Requirements (WDRs) For Discharges of Storm Water Associated With Industrial Activities

2   Excluding Construction Activities," State Water Resources Control Board ("State Board")

3   Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ

4   and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System

5   ("NPDES") Permit No. CAS000001, (hereinafter "the Order" or "Permit").  Defendant's

6   violations of the discharge, treatment technology, monitoring requirements, and other

7   procedural and substantive requirements of the Permit and the Act are ongoing and

8   continuous.

9          2.      The failure on the part of persons and facilities such as Defendant and its

10  industrial facility to comply with storm water requirements is recognized as a significant

11  cause of the continuing decline in water quality of the San Francisco Bay ("Bay") and other

12  area receiving waters.  The general consensus among regulatory agencies and water quality

13  specialists is that storm pollution amounts to a substantial portion of the total pollution

14  entering the aquatic environment each year.  With every rainfall event, millions of gallons of

15  polluted rainwater originating from industries within the surrounding area pour into the Bay.

16         3.      The continuing decline in water quality in the San Francisco Bay is a matter of

17  serious public concern.  Data gathered by CalFed, a coalition of fifteen state and federal

18  agencies analyzing water allocation issues, has confirmed that the Bay is a heavily polluted

19  water body.  The entire Bay and all of its major tributaries have been identified by the State

20  Board, the Regional Board, and EPA as impaired water bodies under Section 303(d) of the

21  Clean Water Act.  33 U.S.C. § 1313(d).

22  **II.     JURISDICTION AND VENUE**

23         4.      This is a civil suit brought under the citizen suit enforcement provisions of the

24  Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or

25  "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter

26  of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28

27  U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is

28  authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of

COMPLAINT

1   actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§

2   1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

3       5.      On or about April 21, 2008, Plaintiff provided notice of Defendant's violations

4   of the Act, and of its intention to file suit against Defendant, to the Defendant; the

5   Administrator of the United States Environmental Protection Agency ("EPA"); the

6   Administrator of EPA Region IX; the Executive Director of the State Water Resources

7   Control Board ("State Board"); and to the Executive Officer of the Regional Water Quality

8   Control Board, San Francisco Bay Region ("Regional Board"). A true and correct copy of

9   CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

10      6.      More than sixty days have passed since notice was served on Defendant and

11  the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that

12  neither the EPA nor the State of California has commenced or is diligently prosecuting a

13  court action to redress the violations alleged in this complaint. This action's claim for civil

14  penalties is not barred by any prior administrative penalty under Section 309(g) of the Act,

15  33 U.S.C. § 1319(g).

16      7.      Venue is proper in the Northern District of California pursuant to Section

17  505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located

18  within this judicial district. Pursuant to Local Rule 3-2(c), intradistrict venue is proper in

19  Oakland, California because the sources of the violations are located within Alameda

20  County, California.

21  **III.   PARTIES**

22      8.      Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

23  ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of

24  California with its main office in Stockton, California. CSPA has approximately 2,000

25  members who live, recreate and work in and around waters of the State of California,

26  including the San Francisco Bay. CSPA is dedicated to the preservation, protection, and

27  defense of the environment, the wildlife and the natural resources of all waters of California.

28  To further these goals, CSPA actively seeks federal and state agency implementation of the

COMPLAINT

3

1   Act and other laws and, where necessary, directly initiates enforcement actions on behalf of

2   itself and its members.

3       9.      Members of CSPA reside in and around the Bay and enjoy using the Bay for

4   recreation and other activities.  Members of CSPA use and enjoy the waters into which

5   Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.

6   Members of CSPA use those areas to fish, sail, boat, kayak, swim, bird watch, view wildlife

7   and engage in scientific study including monitoring activities, among other things.

8   Defendant's discharges of pollutants threaten or impair each of those uses or contribute to

9   such threats and impairments.  Thus, the interests of CSPA's members have been, are being,

10  and will continue to be adversely affected by Defendant's failure to comply with the Clean

11  Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused

12  by Defendant's activities.

13      10.     Plaintiff is informed and believes, and thereupon alleges, that Defendant

14  WASTE MANAGEMENT OF ALAMEDA COUNTY, INC. (hereinafter "Defendant" or

15  "Waste Management") is a corporation organized under the laws of California.  Defendant

16  Waste Management operates the Davis Street Transfer Station, a transfer station for

17  municipal and solid waste, in San Leandro, California.

18  **IV.   STATUTORY BACKGROUND**

19      11.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

20  pollutant into waters of the United States, unless such discharge is in compliance with

21  various enumerated sections of the Act.  Among other things, Section 301(a) prohibits

22  discharges not authorized by, or in violation of, the terms of an NPDES permit issued

23  pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

24      12.     Section 402(p) of the Act establishes a framework for regulating municipal and

25  industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States

26  with approved NPDES permit programs are authorized by Section 402(p) to regulate

27  industrial storm water discharges through individual permits issued to dischargers or through

28  the issuance of a single, statewide general permit applicable to all industrial storm water

COMPLAINT

4

1   dischargers.  33 U.S.C. § 1342(p).

2       13.   Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the

3   U.S. EPA has authorized California's State Board to issue NPDES permits including general

4   NPDES permits in California.

5       14.   The State Board elected to issue a statewide general permit for industrial storm

6   water discharges.  The State Board issued the General Permit on or about November 19,

7   1991, modified the General Permit on or about September 17, 1992, and reissued the

8   General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water

9   Act, 33 U.S.C. § 1342(p).

10      15.   In order to discharge storm water lawfully in California, industrial dischargers

11   must comply with the terms of the General Permit or have obtained and complied with an

12   individual NPDES permit.  33 U.S.C. § 1311(a).

13      16.   The General Permit contains several prohibitions.  Effluent Limitation B(3) of

14   the General Permit requires dischargers to reduce or prevent pollutants in their storm water

15   discharges through implementation of the Best Available Technology Economically

16   Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional

17   Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include

18   both nonstructural and structural measures. General Permit, Section A(8).  Discharge

19   Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-

20   storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

21   Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to

22   any surface or ground water that adversely impact human health or the environment.

23   Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that

24   cause or contribute to an exceedance of any applicable water quality standards contained in a

25   Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

26      17.   EPA has established Parameter Benchmark Values as guidelines for

27   determining whether a facility discharging industrial storm water has implemented the

28   requisite BAT and BCT. 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  EPA has established

COMPLAINT

1    Parameter Benchmark Values for the following parameters, among others: total suspended

2    solids – 100 mg/L; aluminum – 0.75 mg/L; copper – 0.0636 mg/L; iron – 1.0 mg/L; zinc –

3    0.117 mg/L; lead – 0.0816 mg/L; oil & grease – 15 mg/L; chemical oxygen demand – 120

4    mg/L.  The California State Water Resources Control Board has proposed a Benchmark

5    Value for electrical conductance of 200 µmhos/cm.

6         18.    In addition to absolute prohibitions, the General Permit contains a variety of

7    substantive and procedural requirements that dischargers must meet.  Facilities discharging,

8    or having the potential to discharge, storm water associated with industrial activity that have

9    not obtained an individual NPDES permit must apply for coverage under the State's General

10   Permit by filing a Notice of Intent To Comply ("NOI").  The General Permit requires

11   existing dischargers to have filed their NOIs before March 30, 1992.

12        19.    Dischargers must develop and implement a Storm Water Pollution Prevention

13   Plan ("SWPPP").  The SWPPP must describe storm water control equipment and measures

14   that comply with the BAT and BCT standards.  The General Permit requires that an initial

15   SWPPP has been developed and implemented before October 1, 1992.  The SWPPP must,

16   among other requirements, identify and evaluate sources of pollutants associated with

17   industrial activities that may affect the quality of storm and non-storm water discharges from

18   the facility and identify and implement site-specific best management practices ("BMPs") to

19   reduce or prevent pollutants associated with industrial activities in storm water and

20   authorized non-storm water discharges (Section A(2)).  The SWPPP's BMPs must

21   implement BAT and BCT (Section B(3)).  The SWPPP must include: a description of

22   individuals and their responsibilities for developing and implementing the SWPPP (Section

23   A(3)); a site map showing the Facility boundaries, storm water drainage areas with flow

24   pattern and nearby water bodies, the location of the storm water collection, conveyance and

25   discharge system, structural control measures, impervious areas, areas of actual and potential

26   pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials

27   handled and stored at the site (Section A(5)); a description of potential pollutant sources

28   including industrial processes, material handling and storage areas, dust and particulate

COMPLAINT

6

1    generating activities, and a description of significant spills and leaks, a list of all non-storm

2    water discharges and their sources, and a description of locations where soil erosion may

3    occur (Section A(6)). The SWPPP must include an assessment of potential pollutant sources

4    at the Facility and a description of the BMPs to be implemented at the Facility that will

5    reduce or prevent pollutants in storm water discharges and authorized non-storm water

6    discharges, including structural BMPs where non-structural BMPs are not effective (Section

7    A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where

8    necessary (Section A(9),(10)).

9           20.    Section C(11)(d) of the General Permit's Standard Provisions requires

10    dischargers to report any noncompliance to the Regional Board. *See also* Section E(6).

11    Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water

12    controls including the preparation of an evaluation report and implementation of any

13    additional measures in the SWPPP to respond to the monitoring results and other inspection

14    activities.

15           21.    The General Permit requires dischargers commencing industrial activities

16    before October 1, 1992 to develop and implement an adequate written monitoring and

17    reporting program no later than October 1, 1992.  Existing facilities covered under the

18    General Permit had to implement all necessary revisions to their monitoring programs no

19    later than August 1, 1997.

20           22.    As part of their monitoring program, dischargers must identify all storm water

21    discharge locations that produce a significant storm water discharge, evaluate the

22    effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control

23    measures set out in the SWPPP are adequate and properly implemented.  Dischargers must

24    conduct visual observations of these discharge locations for at least one storm per month

25    during the wet season (October through May) and record their findings in their Annual

26    Report.  Dischargers must also collect and analyze storm water samples from at least two

27    storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall

28    collect storm water samples during the first hour of discharge from (1) the first storm event

COMPLAINT

7

1    of the wet season, and (2) at least one other storm event in the wet season. All storm water

2    discharge locations shall be sampled." Section B(5)(c)(i)-(iii) requires dischargers to sample

3    and analyze during the wet season for basic parameters, such as pH, total suspended solids

4    ("TSS"), electrical conductance, and total organic content ("TOC") or oil and grease

5    ("O&G"), certain industry-specific parameters, and toxic chemicals and other pollutants

6    likely to be in the storm water discharged from the facility. Dischargers must also conduct

7    dry season visual observations to identify sources of non-storm water pollution.

8         23.    Section B(14) of the General Permit requires dischargers to submit an annual

9    report by July 1 of each year to the executive officer of the relevant Regional Board. The

10   annual report must be signed and certified by an appropriate corporate officer. Sections

11   B(14), C(9), (10). Section A(9)(d) of the General Permit requires the discharger to include

12   in their annual report an evaluation of their storm water controls, including certifying

13   compliance with the General Permit. *See also* Sections C(9) and (10) and B(14).

14        24.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen

15   enforcement actions against any "person," including individuals, corporations, or

16   partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f),

17   § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. §

18   1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to

19   $27,500 per day (violations from January 30, 1997 through March 15, 2004) and $32,500

20   per day (violations after March 15, 2004) pursuant to Sections 309(d) and 505 of the Act, 33

21   U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

22        25.    The Regional Board has established water quality standards for the San

23   Francisco Bay in the Water Quality Control Plan for the San Francisco Bay Basin, generally

24   referred to as the Basin Plan.

25        26.    The Basin Plan includes a narrative toxicity standard which states that "[a]ll

26   waters shall be maintained free of toxic substances in concentrations that are lethal to or that

27   produce other detrimental responses in aquatic organisms."

28        27.    The Basin Plan provides that "[w]aters shall not contain suspended material in

COMPLAINT

8

1   concentrations that cause nuisance or adversely affect beneficial uses" and that "[w]aters

2   shall not contain biostimulatory substances in concentrations that promote aquatic growths to

3   the extent that such growths cause nuisance or adversely affect beneficial uses."

4          28.    The Basin Plan limits floating material, stating that "[w]aters shall not contain

5   floating material, including solids, liquids, foams, and scum, in concentrations that cause

6   nuisance or adversely affect beneficial uses."

7          29.    The Basin provide provides that "[t]he suspended sediment load and suspended

8   sediment discharge rate of surface waters shall not be altered in such a manner as to cause

9   nuisance or adversely affect beneficial uses."

10         30.    The Basin Plan dictates that "[w]aters shall be free of changes in turbidity that

11  cause nuisance or adversely affect beneficial uses."

12         31.    The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes,

13  or other materials in concentrations that result in a visible film or coating on the surface of

14  the water or on objects in the water, that cause nuisance, or that otherwise adversely affect

15  beneficial uses."

16         32.    The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor

17  raised above 8.5."

18         33.    The Basin Plan establishes a dissolved oxygen standard of 5.0 mg/L for tidal

19  waters of San Francisco Bay downstream from the Carquinez Bridge.

20         34.    The Basin Plan establishes Marine Water Quality Objectives for the following

21  pollutants: zinc – 0.081 mg/L (4-day average), 0.090 mg/L (1-hour average); lead – 0.0081

22  mg/L (4-day average), 0.22 mg/L (1-hour average); and copper 0.0031 mg/L (4-day

23  average), 0.0048 mg/L (1-hour average).

24  **V.     STATEMENT OF FACTS**

25         35.    Defendant Waste Management operates, the Davis Street Transfer Station, a

26  transfer station for commercial and municipal solid waste at 2615 Davis Street in San

27  Leandro, California.  The Facility is engaged in the transfer of solid waste for disposal as

28  well as recycling operations.  The Facility falls within the Standard Industrial Classification

COMPLAINT

9

1   ("SIC") Code 5093.  The Facility covers about 53 acres, the majority of which is paved and

2   used for transporting and storing waste materials throughout the Facility.  On information

3   and belief, Plaintiff alleges that there are at least seven buildings located on the property.  On

4   information and belief, Plaintiff alleges that materials transfer is conducted both inside and

5   outside of these buildings.

6       36.     Defendant channels and collects storm water falling on the Facility though five

7   storm water outfalls.  Each storm drain collects storm water runoff from a particular area of

8   the Facility.   These outfalls discharge the storm water directly to the San Francisco Bay, or

9   to a municipal storm drain that flows to the San Francisco Bay.

10      37.     The industrial activities at the site include the transfer of solid waste from

11  collection vehicles to transport vehicles which move the waste to a remote landfill for

12  disposal, as well as recycling operations for materials such as paper, plastic, glass,

13  wood/yard waste, scrap metal, tires, construction debris, etc.   It also includes the storage and

14  maintenance of trucks, tractors, and other machinery used to transfer and dispose of these

15  materials.

16      38.     Significant activities at the site take place outside and are exposed to rainfall.

17  These activities include transfer, storage, and disposal of the numerous types of materials

18  handled by the Facility; the storage and use of vehicles and equipment for materials

19  handling; and the storage, handling, and disposal of waste materials.  Loading and delivery

20  of materials occurs outside.  Trucks enter and exit the Facility directly from and to a public

21  road.  Trucks, tractors, and other machinery are the primary means of moving materials

22  around the Facility.  The Facility's exposed areas contain large piles of a variety of materials.

23  Plaintiff alleges on information and belief that many of the exposed surfaces at the Facility

24  are unpaved and sediment and other materials are disturbed as a result of the storage and

25  disposal processes.  These areas are exposed to storm water and storm flows due to the lack

26  of overhead coverage, berms, and other storm water controls.

27      39.     Industrial machinery, heavy equipment and vehicles, including trucks and

28  tractors are operated and stored at the Facility in areas exposed to storm water flows.

COMPLAINT

1   Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment

2   leak contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids that are

3   exposed to storm water flows, and that such machinery and equipment track sediment and

4   other contaminants throughout the Facility.

5       40.   Plaintiff is informed and believes, and thereupon alleges that the storm water

6   flows easily over the surface of the Facility, collecting suspended sediment, dirt, oils, grease,

7   and other pollutants as it flows toward the storm water drains.  Storm water and any

8   pollutants contained in that storm water entering the drains flow directly to the San Francisco

9   Bay.

10      41.   The management practices at the Facility are wholly inadequate to prevent the

11  sources of contamination described above from causing the discharge of pollutants to waters

12  of the United States.  The Facility lacks sufficient structural controls such as grading,

13  berming, roofing, containment, or drainage structures to prevent rainfall and storm water

14  flows from coming into contact with these and other exposed sources of contaminants.  The

15  Facility lacks sufficient structural controls to prevent the discharge of water once

16  contaminated.  The Facility lacks adequate storm water pollution treatment technologies to

17  treat storm water once contaminated.

18      42.   Since at least February 2, 2004, Defendant has taken samples or arranged for

19  samples to be taken of storm water discharges at the Facility.  The sample results were

20  reported in the Facility's annual reports submitted to the Regional Board.  Defendant Waste

21  Management certified each of those annual reports pursuant to Sections A and C of the

22  General Permit.

23      43.   Since at least February 2, 2004, the Facility has detected total suspended

24  solids, chemical oxygen demand, oil & grease, aluminum, copper, iron, zinc, lead, and

25  electrical conductance in storm water discharged from the Facility.  Levels of these

26  pollutants detected in the Facility's storm water have been in excess of EPA's numeric

27  parameter benchmark values.   Levels of these pollutants detected in the Facility's storm

28  water have been in excess of water quality standards established in the Basin Plan.

COMPLAINT

11

44.     The levels of total suspended solids in storm water detected by the Facility have exceeded the benchmark value for total suspended solids of 100 mg/L established by EPA.  For example, on May 19, 2006, the level of suspended solids measured by Defendant in the Facility's discharged storm water was 1,800 mg/L.  That level of total suspended solids is 18 times the benchmark value for suspended solids established by EPA.

45.     The levels of chemical oxygen demand in storm water detected by the Facility have exceeded the benchmark value for chemical oxygen demand of 120 mg/L established by EPA.  For example, on May 19, 2006, the level of chemical oxygen demand measured by Defendant in the Facility's discharged storm water was 630 mg/L.  That level of chemical oxygen demand is over five times the benchmark value for chemical oxygen demand established by EPA.

46.     The levels of oil & grease in storm water detected by the Facility have exceeded the benchmark value for oil & grease of 15 mg/L established by EPA.  For example, on November 4, 2005, the level of oil & grease measured by Defendant in the Facility's discharged storm water was 52 mg/L.  That level of oil & grease is nearly three and a half times the benchmark value for oil & grease established by EPA.

47.     The levels of aluminum in storm water detected by the Facility have exceeded the benchmark value for aluminum of 0.75 mg/L established by EPA.  For example, on May 19, 2006, the level of aluminum measured by Defendant in the Facility's discharged storm water was 220 mg/L.  That level of aluminum is over 293 times the benchmark value for aluminum established by EPA.

48.     The levels of copper in storm water detected by the Facility have exceeded the benchmark value for copper of 0.0636 mg/L established by EPA.  For example, on May 19, 2006, the level of copper measured by Defendant in the Facility's discharged storm water was 1.8 mg/L.  That level of copper is over 28 times the benchmark value for copper established by EPA.

49.     The levels of iron in storm water detected by the Facility have exceeded the benchmark value for iron of 1.0 mg/L established by EPA.  For example, on May 19, 2006,

COMPLAINT

12

1   the level of iron measured by Defendant in the Facility's discharged storm water was 310

2   mg/L. That level of iron is 310 times the benchmark value for iron established by EPA.

3         50.     The levels of zinc in storm water detected by the Facility have exceeded the

4   benchmark value for zinc of 0.117 mg/L established by EPA. For example, on May 19,

5   2006, the level of zinc measured by Defendant in the Facility's discharged storm water was

6   11 mg/L. That level of zinc is over 94 times the benchmark value for zinc established by

7   EPA.

8         51.     The levels of lead in storm water detected by the Facility have exceeded the

9   benchmark value for lead of 0.0816 mg/L established by EPA. For example, on May 19,

10   2006, the level of lead measured by Defendant in the Facility's discharged storm water was

11   3.4 mg/L. That level of lead is nearly 42 times the benchmark value for lead established by

12   EPA.

13         52.     The electrical conductance levels detected by the Facility in its storm water

14   have been greater than the numeric water quality standards applicable to electrical

15   conductance in California. The electrical conductance levels detected by the Facility in its

16   storm water have been greater than the benchmark value of 200 μmho/cm proposed by the

17   State Board. For example, on May 19, 2006, the electrical conductance level measured by

18   Defendant in the Facility's discharged storm water was 1500 μmho/cm. That electrical

19   conductance level is over seven times the State Board's proposed benchmark value.

20         53.     On information and belief, Plaintiff alleges that Defendants have failed to

21   sample or monitor any storm water discharge locations during the 2004-2005 and 2006-2007

22   rainy seasons in violation of Sections B(4) and B(5) of the General Permit.

23         54.     On information and belief, Plaintiff alleges that since at least February 2, 2004,

24   Defendant has failed to implement BAT and BCT at the Facility for its discharges of total

25   suspended solids, chemical oxygen demand, oil & grease, aluminum, copper, iron, zinc, lead,

26   and electrical conductance. Section B(3) of the General Permit requires that Defendant

27   implement BAT for toxic and nonconventional pollutants and BCT for conventional

28   pollutants by no later than October 1, 1992. As of the date of this Complaint, Defendant has

COMPLAINT

13

1    failed to implement BAT and BCT.

2        55.    On information and belief, Plaintiff alleges that since at least October 1, 1992,

3    Defendant has failed to implement an adequate SWPPP for the Facility. Plaintiff is informed

4    and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set

5    forth site-specific best management practices for the Facility that are consistent with BAT or

6    BCT for the Facility. Plaintiff is informed and believes, and thereupon alleges, that the

7    SWPPP prepared for the Facility does not include an assessment of potential pollutant

8    sources, structural pollutant control measures employed by the Defendant, a list of actual and

9    potential areas of pollutant contact, or a description of best management practices to be

10   implemented at the Facility to reduce pollutant discharges. According to information

11   available to CSPA, Defendant's SWPPP has not been evaluated to ensure effectiveness and

12   revised where necessary to further reduce pollutant discharges. Plaintiff is informed and

13   believes, and thereupon alleges, that the SWPPP does not include each of the mandatory

14   elements required by Section A of the General Permit. Plaintiff is informed and believes,

15   and thereupon alleges, that the SWPPP does not contain an accurate map that clearly

16   delineates the boundaries of the Facility.

17       56.    Information available to CSPA indicates that as a result of these practices,

18   storm water containing excessive pollutants is being discharged during rain events from the

19   Facility directly to the San Francisco Bay.

20       57.    The San Francisco Bay has been identified by the Regional Board, State Board

21   and federal EPA as impaired for several pollutants, including mercury and unknown toxicity.

22       58.    Plaintiff is informed and believes, and thereupon alleges, that pollutants

23   discharged by the Facility in its storm water are contributing to violations of water quality

24   standards that apply to the San Francisco Bay and its tributaries. Plaintiff is informed and

25   believes, and thereupon alleges, that Defendant is discharging total suspended solids,

26   chemical oxygen demand, oil & grease, aluminum, copper, iron, zinc, lead, electrical

27   conductance, and other un-monitored pollutants that are causing or contributing to

28   exceedances of applicable water quality standards. Defendant is contributing to violations of

COMPLAINT
                                    14

water quality standards including, but not limited to, the narrative water quality standard for toxicity and turbidity and the numeric water quality standard for electrical conductance.

59.     Plaintiff is informed and believes that Defendant failed to submit to the Regional Board a true and complete annual report certifying compliance with the General Permit since at least February 2, 2004.  Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant must submit an annual report, that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and certifying compliance with the General Permit.  Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete annual reports that purported to comply with the General Permit when there was significant noncompliance at the Facility.

60.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of polluted storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Develop and Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

61.     Plaintiff realleges and incorporate Paragraphs 1-60, as if fully set forth herein.

62.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of suspended solids, chemical oxygen demand, oil & grease, aluminum, copper, iron, zinc, lead, electrical conductance and other un-monitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

63.     Each day since October 1, 1992 that Defendant has failed to develop and

COMPLAINT

15

1  implement BAT and BCT in violation of the General Permit is a separate and distinct violation

2  of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

3        64.   Defendant has been in violation of the BAT/BCT requirements every day since

4  October 1, 1992.  Defendant continues to be in violation of the BAT/BCT requirements each

5  day that it fails to develop and fully implement BAT and BCT at the Facility.

6                       **SECOND CAUSE OF ACTION**
7         **Failure to Prepare, Implement, Review, and Update**
       **an Adequate Storm Water Pollution Prevention Plan**
8     **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

9        65.   Plaintiff realleges and incorporate Paragraphs 1-64, as if fully set forth herein.

10        66.   Section A and Provision E of the General Permit requires dischargers of storm

11  water associated with industrial activity to have developed and be implementing an adequate

12  SWPPP no later than October 1, 1992.

13        67.   Defendant has failed to develop and implement an adequate SWPPP for the

14  Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the

15  Facility is evidenced by, *inter alia*, Defendant's outdoor storage of various materials, without

16  appropriate best management practices; the continued exposure of significant quantities of

17  various materials to storm water flows; the continued exposure and tracking of waste resulting

18  from the operation or maintenance of vehicles at the site; the failure to either treat storm water

19  prior to discharge or to implement effective containment practices; and the continued

20  discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark

21  values.

22        68.   Defendant has failed to update the Facility's SWPPP in response to the

23  analytical results of the Facility's storm water monitoring.

24        69.   Each day since October 1, 1992 that Defendant has failed to develop, implement

25  and update an adequate SWPPP for the Facility is a separate and distinct violation of Section

26  301(a) of the Act, 33 U.S.C. § 1311(a).

27        70.   Defendant has been in violation of the SWPPP requirements every day since

28  October 1, 1992.  Defendant continues to be in violation of the SWPPP requirements each day

COMPLAINT

16

1    that it fails to develop and fully implement an adequate SWPPP for the Facility.

2    <strong>THIRD CAUSE OF ACTION</strong>

3    <strong>Failure to Develop and Implement an Adequate Monitoring and Reporting Program<br/>(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)</strong>

4         71.    Plaintiff re-alleges and incorporates Paragraphs 1-70, inclusive, as if fully set

5    forth herein.

6         72.    Section B of the General Permit requires dischargers of storm water associated

7    with industrial activity to have developed and be implementing a monitoring and reporting

8    program (including, *inter alia*, sampling and analysis of discharges) no later than October 1,

9    1992.

10         73.    Defendant has failed to develop and implement an adequate monitoring and

11    reporting program for the Facility. Defendant's ongoing failure to develop and implement

12    an adequate monitoring and reporting program are evidenced by, *inter alia*, their failure to

13    monitor and sample storm water discharges during the 2004-2005 and 2006-2007 rainy

14    seasons.

15         74.    Each day since October 1, 1992 that Defendant has failed to develop and

16    implement an adequate monitoring and reporting program for the Facility in violation of the

17    General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §

18    1311(a). The absence of requisite monitoring and analytical results are ongoing and

19    continuous violations of the Act.

20    <strong>FOURTH CAUSE OF ACTION</strong>

21    <strong>Discharges of Contaminated Storm Water<br/>in Violation of Permit Conditions and the Act<br/>(Violations of 33 U.S.C. §§ 1311(a), 1342)</strong>

22   

23         75.    Plaintiff re-alleges and incorporates Paragraphs 1-74, inclusive, as if fully set

24    forth herein.

25         76.    Discharge Prohibition A(2) of the General Permit requires that storm water

26    discharges and authorized non-storm water discharges shall not cause or threaten to cause

27    pollution, contamination, or nuisance. Receiving Water Limitations C(1) and C(2) of the

28    General Permit require that storm water discharges and authorized non-storm water discharges

COMPLAINT

1  shall not adversely impact human health or the environment, and shall not cause or contribute

2  to a violation of any water quality standards contained in a Statewide Water Quality Control

3  Plan or the applicable Regional Board's Basin Plan.

4      77.   Plaintiff is informed and believes, and thereupon alleges, that since at least May

5  23, 2003, Defendant has been discharging polluted storm water from the Facility directly to

6  the San Francisco Bay, in violation of the Discharge Prohibition A(2) of the General Permit.

7      78.   During every rain event, rainwater flows freely over exposed materials, waste

8  products, and other accumulated pollutants at the Facility, becoming contaminated with these

9  pollutants. The rainwater then flows untreated from the Facility into channels or storm drains.

10  This contaminated storm water flows into the San Francisco Bay.

11      79.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of

12  contaminated storm water are causing pollution and contamination of the waters of the United

13  States in violation of Discharge Prohibition A(2) of the General Permit.

14      80.   Plaintiff is informed and believes, and thereupon alleges, that these discharges

15  of contaminated storm water are adversely affecting human health and the environment in

16  violation of Receiving Water Limitation C(1) of the General Permit.

17      81.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of

18  contaminated storm water are contributing to the violation of the applicable water quality

19  standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's

20  Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

21      82.   Every day since at least May 23, 2003, that Defendant has discharged and

22  continues to discharge polluted storm water from the Facility in violation of the General Permit

23  is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These

24  violations are ongoing and continuous.

25                      **FIFTH CAUSE OF ACTION**
                **False Certification of Compliance In Annual Report**
26          **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

27      83.   Plaintiff realleges and incorporate Paragraphs 1-82, as if fully set forth herein.

28      84.   Defendant has falsely certified compliance with the General Permit in each of

COMPLAINT                                  18

1   the annual reports submitted to the Regional Board since at least June 2004.

2         85.    Each day since at least June 29, 2004 that Defendant has falsely certified

3   compliance with the General Permit is a separate and distinct violation of the General Permit

4   and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of

5   the General Permit's certification requirement each day that it maintains its false certification

6   of its compliance with the General Permit.

7   **VII.   RELIEF REQUESTED**

8         Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

9            a.  Declare Defendant to have violated and to be in violation of the Act as

10  alleged herein;

11           b.  Enjoin Defendant from discharging polluted storm water from the Facility

12  unless authorized by the Permit;

13           c.  Enjoin Defendant from further violating the substantive and procedural

14  requirements of the Permit;

15           d.  Order Defendant to immediately implement storm water pollution control

16  and treatment technologies and measures that are equivalent to BAT or BCT and prevent

17  pollutants in the Facility's storm water from contributing to violations of any water quality

18  standards;

19           e.  Order Defendant to comply with the Permit's monitoring and reporting

20  requirements, including ordering supplemental monitoring to compensate for past monitoring

21  violations;

22           f.  Order Defendant to prepare a SWPPP consistent with the Permit's

23  requirements and implement procedures to regularly review and update the SWPPP;

24           g.  Order Defendant to provide Plaintiff with reports documenting the quality

25  and quantity of their discharges to waters of the United States and their efforts to comply with

26  the Act and the Court's orders;

27           h.  Order Defendant to pay civil penalties of $27,500 per day per violation for

28  all violations occurring before March 15, 2004, and $32,500 per day per violation for all

COMPLAINT

19

1   violations occurring after August 28, 2002, for each violation of the Act pursuant to Sections

2   309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

3          i.   Order Defendant to take appropriate actions to restore the quality of waters

4   impaired or adversely affected by their activities;

5          j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness,

6   compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

7          k.   Award any such other and further relief as this Court may deem appropriate.

8

9   Dated: July 21, 2008                    Respectfully submitted,

10                                          LOZEAU DRURY LLP

11                                   By:    _____

12                                          Douglas J. Chermak
                                            Attorney for Plaintiff
13                                          CALIFORNIA SPORTFISHING PROTECTION
                                            ALLIANCE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                          20

# EXHIBIT A

# California Sportfishing Protection Alliance

*"An Advocate for Fisheries, Habitat and Water Quality"*
3536 Rainier Avenue, Stockton, CA 95204
Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

April 16, 2008

Jack Isola, Manager
Davis Street Station for Material Recycling and Transfer
Waste Management of Alameda County, Inc.
2615 Davis Street
San Leandro, CA  94577

Stuart Clark, President
Waste Management of Alameda County, Inc.
172 98th Ave
Oakland, CA  94603

Waste Management of California, Inc.
1001 Fannin, Suite 4000
Houston, TX  77002

Re:     **Notice of Violations and Intent to File Suit Under the Federal Water
        Pollution Control Act**

Dear Mr. Isola and Mr. Clark:

I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in
regard to violations of the Clean Water Act ("Act") that CSPA believes are occurring at the
Davis Street Station for Material Recycling and Transfer  ("Facility") located at 2615 Davis
Street in San Leandro, California.   CSPA is a non-profit public benefit corporation dedicated to
the preservation, protection, and defense of the environment, wildlife, and natural resources of
the San Francisco Bay and other California waters. This letter is being sent to you as the
responsible owners, officers, or operators of the Facility (all recipients are hereinafter
collectively referred to as "Davis Street Station").

This letter addresses Davis Street Station's unlawful discharge of pollutants from the
Facility into San Francisco Bay.  The Facility is discharging storm water pursuant to National
Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, California
Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board") Order
No. 92-12-DWQ as amended by Order No. 97-03-DWQ (hereinafter "General Permit").  The
WDID identification number for the Facility listed on documents submitted to the Regional
Board is 2011002422.  The Facility is engaged in ongoing violations of the substantive and

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 2 of 17

procedural requirements of the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Davis Street Station is hereby placed on formal notice by CSPA that, after the expiration of sixty days from the date of this Notice of Violation and Intent to Sue, CSPA intends to file suit in federal court against Waste Management of Alameda County, Inc., Waste Management of California, Inc., Jack Isola, and Stuart Clark under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the Order. These violations are described more extensively below.

I.    **Background.**

On November 4, 1997, Davis Street Station filed its Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI"). Davis Street Station certifies that the Facility is classified under SIC code 5093 ("processing of scrap material") and under SIC code 4212 ("local trucking without storage"). The Facility collects and discharges storm water from its 53-acre industrial site through at least five outfalls that discharge into the San Francisco Bay. The Regional Board has identified waters of San Francisco Bay as failing to meet applicable water quality standards for PCBs, selenium, exotic species, dioxins, pesticides, and mercury. *See* http://www.waterboards.ca.gov/tmdl/docs/ 303dlists2006/final/r2_final303dlist.pdf.

The Regional Board has identified beneficial uses of the Bay region's waters and established water quality standards for the San Francisco Bay in the "Water Quality Control Plan for the San Francisco Bay Basin," generally referred to as the Basin Plan. *See* http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/basin_plan/docs/basin_p lan07.pdf. The beneficial uses of these waters include among others contact and non-contact recreation, fish migration, endangered and threatened species habitat, shellfish harvesting, and fish spawning. The non-contact recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tide pool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities. Water quality considerations relevant to non-contact water recreation, such as hiking, camping, or boating, and those activities related to tide pool or other nature studies require protection of habitats and aesthetic features." *Id.* at 2.1.16. Visible pollution, including visible sheens and cloudy or

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 3 of 17

muddy water from industrial areas, impairs people's use of the Bay for contact and non-contact water recreation.

The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal or that produce other detrimental responses in aquatic organisms." *Id.* at 3.3.18. The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or otherwise adversely affect beneficial uses." *Id.* at 3.3.7. The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses." *Id.* at 3.3.14. The Basin Plan establishes Marine Water Quality Objectives for zinc of 0.081 mg/L (4-day average) and 0.090 mg/L (1-hour average); copper of 0.0031 mg/L (4-day average) and 0.0048 mg/L (1-hour average); and lead of 0.0081 mg/L (4 day average) and 0.21 mg/L (1hour average). *Id.* at Table 3-3. EPA has adopted numeric water quality standards for copper of .0031 mg/L (4-day average) and .0048 mg/L (1-hour average), for lead of .210 mg/L (4-day average) and .0081 mg/L (1-hour average), and for zinc of .090 mg/L (4-day average) and .081 mg/L (1-hour average). 65 Fed.Reg. 31712 (May 18, 2000).

The U.S. Environmental Protection Agency ("EPA") has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by Davis Street Station: pH – 6.0-9.0 units; total suspended solids ("TSS") – 100 mg/L, oil and grease ("O&G") – 15 mg/L, chemical oxygen demand ("COD") – 120 mg/L, aluminum – .75 mg/L, zinc – 0.117 mg/L, iron – 1 mg/L, copper – .0636 mg/L, lead – .0816 mg/L. The State Water Quality Control Board also has proposed adding a benchmark level to the General Permit for specific conductance (200 μmho/cm).

## II.   Alleged Violations of the NPDES Permit.

### A.   *Discharges in Violation of the Permit.*

Davis Street Station has violated and continues to violate the terms and conditions of the General Industrial Storm Water Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit. The General Permit prohibits any discharges of storm water associated with industrial activities or authorized non-storm water discharges that have not been subjected to BAT or BCT. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 4 of 17

("BOD"), and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. *Id.*; 40 C.F.R. § 401.15.

In addition, Discharge Prohibition A(1) of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States. Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Davis Street Station has discharged and continues to discharge storm water with unacceptable levels of total suspended solids, specific conductivity, oil & grease, chemical oxygen demand, aluminum, copper, iron, lead, zinc and other pollutants in violation of the General Permit. Davis Street Station's sampling and analysis results reported to the Regional Board confirm discharges of specific pollutants and materials other than storm water in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

| Date | Parameter | Observed Concentration | Benchmark Value | Location (as identified by the Facility) |
|------|-----------|------------------------|-----------------|------------------------------------------|
| 5/19/2006 | Total Suspended Solids | 150 mg/L | 100 mg/L | Northwest Outfall |
| 5/19/2006 | Specific Conductivity | 1,200 µmho/cm | 200 µmho/cm (proposed) | Northwest Outfall |
| 5/19/2006 | Chemical Oxygen Demand | 630 mg/L | 120 mg/L | Northwest Outfall |
| 5/19/2006 | Aluminum | 4.5 mg/L | 0.75 mg/L | Northwest Outfall |
| 5/19/2006 | Copper | 0.07 mg/L | 0.0636 mg/L | Northwest Outfall |
| 5/19/2006 | Iron | 6.9 mg/L | 1.0 mg/L | Northwest Outfall |
| 5/19/2006 | Zinc | 0.44 mg/L | 0.117 mg/L | Northwest Outfall |

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 5 of 17

| 5/19/2006 | Total Suspended Solids | 670 mg/L | 100 mg/L | Facility Entrance |
|---|---|---|---|---|
| 5/19/2006 | Specific Conductivity | 1,200 μmho/cm | 200 μmho/cm (proposed) | Facility Entrance |
| 5/19/2006 | Chemical Oxygen Demand | 210 mg/L | 120 mg/L | Facility Entrance |
| 5/19/2006 | Aluminum | 11 mg/L | 0.75 mg/L | Facility Entrance |
| 5/19/2006 | Copper | 0.11 mg/L | 0.0636 mg/L | Facility Entrance |
| 5/19/2006 | Iron | 15 mg/L | 1.0 mg/L | Facility Entrance |
| 5/19/2006 | Lead | 0.18 mg/L | 0.0816 mg/L | Facility Entrance |
| 5/19/2006 | Zinc | 0.71 mg/L | 0.117 mg/L | Facility Entrance |
| 5/19/2006 | Total Suspended Solids | 1,800 mg/L | 100 mg/L | Northeast Outfall |
| 5/19/2006 | Specific Conductivity | 1,500 μmho/cm | 200 μmho/cm (proposed) | Northeast Outfall |
| 5/19/2006 | Chemical Oxygen Demand | 310 mg/L | 120 mg/L | Northeast Outfall |
| 5/19/2006 | Aluminum | 220 mg/L | 0.75 mg/L | Northeast Outfall |
| 5/19/2006 | Copper | 1.8 mg/L | 0.0636 mg/L | Northeast Outfall |
| 5/19/2006 | Iron | 310 mg/L | 1.0 mg/L | Northeast Outfall |
| 5/19/2006 | Lead | 3.4 mg/L | 0.0816 mg/L | Northeast Outfall |
| 5/19/2006 | Zinc | 11 mg/L | 0.117 mg/L | Northeast Outfall |
| 5/19/2006 | Total Suspended Solids | 1,500 mg/L | 100 mg/L | Southeast Outfall |
| 5/19/2006 | Specific Conductivity | 1,400 μmho/cm | 200 μmho/cm (proposed) | Southeast Outfall |
| 5/19/2006 | Chemical Oxygen Demand | 210 mg/L | 120 mg/L | Southeast Outfall |
| 5/19/2006 | Aluminum | 26 mg/L | 0.75 mg/L | Southeast Outfall |
| 5/19/2006 | Copper | 0.1 mg/L | 0.0636 mg/L | Southeast Outfall |
| 5/19/2006 | Iron | 37 mg/L | 1.0 mg/L | Southeast Outfall |
| 5/19/2006 | Lead | 0.18 mg/L | 0.0816 mg/L | Southeast Outfall |
| 5/19/2006 | Zinc | 0.58 mg/L | 0.117 mg/L | Southeast Outfall |
| 11/4/2005 | Total Suspended Solids | 500 mg/L | 100 mg/L | Facility Entrance |
| 11/4/2005 | Specific Conductivity | 990 μmho/cm | 200 μmho/cm (proposed) | Facility Entrance |
| 11/4/2005 | Oil & Grease | 52 mg/L | 15 mg/L | Facility Entrance |
| 11/4/2005 | Chemical Oxygen Demand | 280 mg/L | 120 mg/L | Facility Entrance |
| 11/4/2005 | Aluminum | 26 mg/L | 0.75 mg/L | Facility Entrance |

Notice of Violation and Intent to File Suit

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 6 of 17

| 11/4/2005 | Copper | 0.17 mg/L | 0.0636 mg/L | Facility Entrance |
|-----------|--------|-----------|-------------|-------------------|
| 11/4/2005 | Iron | 39 mg/L | 1.0 mg/L | Facility Entrance |
| 11/4/2005 | Lead | 0.32 mg/L | 0.0816 mg/L | Facility Entrance |
| 11/4/2005 | Zinc | 1.3 mg/L | 0.117 mg/L | Facility Entrance |
| 11/4/2005 | Total Suspended Solids | 200 mg/L | 100 mg/L | Recycling Center |
| 11/4/2005 | Specific Conductivity | 1,200 µmho/cm | 200 µmho/cm (proposed) | Recycling Center |
| 11/4/2005 | Oil & Grease | 43 mg/L | 15 mg/L | Recycling Center |
| 11/4/2005 | Chemical Oxygen Demand | 1,100 mg/L | 120 mg/L | Recycling Center |
| 11/4/2005 | Aluminum | 4.4 mg/L | 0.75 mg/L | Recycling Center |
| 11/4/2005 | Copper | 0.077 mg/L | 0.0636 mg/L | Recycling Center |
| 11/4/2005 | Iron | 6.9 mg/L | 1.0 mg/L | Recycling Center |
| 11/4/2005 | Lead | 0.086 mg/L | 0.0816 mg/L | Recycling Center |
| 11/4/2005 | Zinc | 0.67 mg/L | 0.117 mg/L | Recycling Center |
| 11/4/2005 | Total Suspended Solids | 840 mg/L | 100 mg/L | Northeast Outfall |
| 11/4/2005 | Specific Conductivity | 2,700 µmho/cm | 200 µmho/cm (proposed) | Northeast Outfall |
| 11/4/2005 | Oil & Grease | 78 mg/L | 15 mg/L | Northeast Outfall |
| 11/4/2005 | Chemical Oxygen Demand | 1,000 mg/L | 120 mg/L | Northeast Outfall |
| 11/4/2005 | Aluminum | 20 mg/L | 0.75 mg/L | Northeast Outfall |
| 11/4/2005 | Copper | 0.26 mg/L | 0.0636 mg/L | Northeast Outfall |
| 11/4/2005 | Iron | 29 mg/L | 1.0 mg/L | Northeast Outfall |
| 11/4/2005 | Lead | 0.36 mg/L | 0.0816 mg/L | Northeast Outfall |
| 11/4/2005 | Zinc | 1.5 mg/L | 0.117 mg/L | Northeast Outfall |
| 11/4/2005 | pH | 1.3 pH units | 6.0 – 9.0 pH units | Southeast Outfall |
| 11/4/2005 | Total Suspended Solids | 520 mg/L | 100 mg/L | Southeast Outfall |
| 11/4/2005 | Specific Conductivity | 22,000 µmho/cm | 200 µmho/cm (proposed) | Southeast Outfall |
| 11/4/2005 | Oil & Grease | 40 mg/L | 15 mg/L | Southeast Outfall |
| 11/4/2005 | Chemical Oxygen Demand | 220 mg/L | 120 mg/L | Southeast Outfall |
| 11/4/2005 | Aluminum | 41 mg/L | 0.75 mg/L | Southeast Outfall |
| 11/4/2005 | Copper | 0.26 mg/L | 0.0636 mg/L | Southeast Outfall |
| 11/4/2005 | Iron | 58 mg/L | 1.0 mg/L | Southeast Outfall |
| 11/4/2005 | Lead | 0.72 mg/L | 0.0816 mg/L | Southeast Outfall |
| 11/4/2005 | Zinc | 2.3 mg/L | 0.117 mg/L | Southeast Outfall |

Notice of Violation and Intent to File Suit

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 7 of 17

| 3/25/2004 | Total Suspended Solids | 570 mg/L | 100 mg/L | North Central Out Fall |
|---|---|---|---|---|
| 3/25/2004 | Specific Conductivity | 1,200 µmho/cm | 200 µmho/cm (proposed) | North Central Out Fall |
| 3/25/2004 | Chemical Oxygen Demand | 630 mg/L | 120 mg/L | North Central Out Fall |
| 3/25/2004 | Aluminum | 12 mg/L | 0.75 mg/L | North Central Out Fall |
| 3/25/2004 | Copper | 0.14 mg/L | 0.0636 mg/L | North Central Out Fall |
| 3/25/2004 | Iron | 22 mg/L | 1.0 mg/L | North Central Out Fall |
| 3/25/2004 | Lead | 0.14 mg/L | 0.0816 mg/L | North Central Out Fall |
| 3/25/2004 | Zinc | 1.1 mg/L | 0.117 mg/L | North Central Out Fall |
| 3/25/2004 | Total Suspended Solids | 200 mg/L | 100 mg/L | North East Out Fall |
| 3/25/2004 | Chemical Oxygen Demand | 150 mg/L | 120 mg/L | North East Out Fall |
| 3/25/2004 | Aluminum | 6.8 mg/L | 0.75 mg/L | North East Out Fall |
| 3/25/2004 | Copper | 0.066 mg/L | 0.0636 mg/L | Out Fall |
| 3/25/2004 | Iron | 11 mg/L | 1.0 mg/L | North East Out Fall |
| 3/25/2004 | Zinc | 0.53 mg/L | 0.117 mg/L | North East Out Fall |
| 2/2/2004 | Total Suspended Solids | 1,900 mg/L | 100 mg/L | North Central Out Fall |
| 2/2/2004 | Oil & Grease | 26 mg/L | 15 mg/L | North Central Out Fall |
| 2/2/2004 | Chemical Oxygen Demand | 140 mg/L | 120 mg/L | North Central Out Fall |
| 2/2/2004 | Aluminum | 13 mg/L | 0.75 mg/L | North Central Out Fall |
| 2/2/2004 | Copper | 0.11 mg/L | 0.0636 mg/L | North Central Out Fall |
| 2/2/2004 | Iron | 25 mg/L | 1.0 mg/L | North Central Out Fall |
| 2/2/2004 | Lead | 0.16 mg/L | 0.0816 mg/L | North Central Out Fall |
| 2/2/2004 | Zinc | 0.71 mg/L | 0.117 mg/L | North Central Out Fall |

Notice of Violation and Intent to File Suit

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 8 of 17

| 2/2/2004 | Total Suspended Solids | 680 mg/L | 100 mg/L | North East Out Fall |
|---|---|---|---|---|
| 2/2/2004 | Specific Conductivity | 340 µmho/cm | 200 µmho/cm (proposed) | North East Out Fall |
| 2/2/2004 | Aluminum | 24 mg/L | 0.75 mg/L | North East Out Fall |
| 2/2/2004 | Copper | 0.16 mg/L | 0.0636 mg/L | North East Out Fall |
| 2/2/2004 | Iron | 40 mg/L | 1.0 mg/L | North East Out Fall |
| 2/2/2004 | Lead | 0.17 mg/L | 0.0816 mg/L | North East Out Fall |
| 2/2/2004 | Zinc | 0.95 mg/L | 0.117 mg/L | North East Out Fall |

CSPA's investigation, including its review of Davis Street Station's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of applicable water quality standards, EPA's benchmark values and the State Board's proposed benchmark for electrical conductivity, indicates that Davis Street Station has not implemented BAT and BCT at the Facility for its discharges of TSS, specific conductivity, O&G, COD, aluminum, copper, iron, lead, zinc and other pollutants, in violation of Effluent Limitation B(3) of the General Permit. Davis Street Station was required to have implemented BAT and BCT by no later than October 1, 1992. Thus, Davis Street Station is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT. In addition, the above numbers indicate that the facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit. CSPA alleges that such violations also have occurred and will occur on other rain dates, including every significant rain event that has occurred since April 16, 2003, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Davis Street Station has discharged storm water containing impermissible levels of TSS, specific conductivity, O&G, COD, aluminum, copper, iron, lead, zinc in violation of Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing any of these pollutants constitutes a separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Davis Street Station is subject to penalties for violations of the General Permit and the Act since April 16, 2003.

Notice of Violation and Intent to File Suit

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 9 of 17

### B.        *Failure to Identify and Control Non-Storm Water Discharges*

The General Permit requires that facility operators "investigate the facility to identify all non-storm water discharges and their sources. As part of this investigation, all drains (inlets and outlets) shall be evaluated to identify whether they connect to the storm drain system. All non-storm water discharges shall be described. This shall include the source, quantity, frequency, and characteristics of the non-storm water discharges and associated drainage area." Section A(6)(a)(v).

The General Permit authorizes certain non-storm water discharges providing that the non-storm water discharges are in compliance with Regional Board requirements; that the non-storm water discharges are in compliance with local agency ordinances and/or requirements; that BMPs are included in the SWPPP to (1) prevent or reduce the contact of non-storm water discharges with significant materials or equipment and (2) minimize, to the extent practicable, the flow or volume of non-storm water discharges; that the non-storm water discharges do not contain significant quantities of pollutants; and that the monitoring program includes quarterly visual observations of each non-storm water discharge and its sources to ensure that BMPs are being implemented and are effective (Special Conditions D). Section B(3) of the General Permit requires dischargers to conduct visual observations of all drainage areas for the presence of non-storm water discharges, to observe the non-storm water discharges, and maintain records of such observations.

CSPA, on information and belief, alleges that the Facility discharges unauthorized non-storm water at the Facility, including dust suppression water and wash water. On information and belief, CSPA further alleges that the Facility has failed to identify and control non-storm water discharges in violation of Sections A(6)(a)(v) and B(3) and D of the General Permit. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Davis Street Station is subject to penalties for violations of the General Permit and the Act since April 16, 2003.

### C.        *Failure to Prepare, Implement, Review and Update an Adequate Storm Water Pollution Prevention Plan.*

Section A and Provision E(2) of the General Industrial Storm Water Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the General Permit to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices

Notice of Violation and Intent to File Suit

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 10 of 17

("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).

CSPA's investigation of the conditions at the Facility as well as Davis Street Station's Annual Reports indicate that Davis Street Station has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Davis Street Station has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Davis Street Station has been in continuous violation of Section A and Provision E(2) of the General Permit every day since April 16, 2003 at the very latest, and will continue to be in violation every day that Davis Street Station fails to prepare, implement, review, and update an effective SWPPP. Davis Street Station is subject to penalties for violations of the Order and the Act occurring since April 16, 2003.

**D.      *Failure to Develop and Implement an Adequate Monitoring and Reporting Program***

Section B of the General Permit describes the monitoring requirements for storm water and non-storm water discharges. Facilities are required to make monthly visual observations of storm water discharges (Section B(4)) and quarterly visual observations of both unauthorized and authorized non-storm water discharges (Section B(3)). Section B(5) requires facility operators to sample and analyze at least two storm water discharges from all storm water discharge locations during each wet season. Section B(7) requires that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 11 of 17

The above referenced data was obtained from the Facility's monitoring program as reported in its Annual Reports submitted to the Regional Board. This data is evidence that the Facility has violated various Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations in the General Permit. In addition, the Facility failed to sample or monitor any storm water discharge locations during the 2006-2007 and 2004-2005 rainy seasons based on a general claim that no qualifying events occurred at the Facility. To the extent the storm water data collected by Davis Transfer Station is not representative of the quality of the Facility's various storm water discharges or the Facility failed to monitor all qualifying storm water discharges, CSPA, on information and belief, alleges that the Facility's monitoring program violates Sections B(3), (4), (5) and (7) of the General Permit. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Davis Street Station is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since April 16, 2003.

### E.     Failure to File True and Correct Annual Reports.

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

For the last five years, Davis Street Station and its agent, Jack Isola, inaccurately certified in their Annual Reports that the facility was in compliance with the General Permit. Consequently, Davis Street Station has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time Davis Street Station failed to submit a complete or correct report and every time Davis Street Station or its agents falsely purported to comply with the Act. Davis Street Station is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since April 16, 2003.

### IV.     Persons Responsible for the Violations.

CSPA puts Waste Management of Alameda County, Inc., Waste Management of California, Inc., Jack Isola, and Stuart Clark on notice that they are the persons responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Waste Management of Alameda County, Inc., Waste Management of California, Inc., Jack Isola, and Stuart Clark on notice that it intends to include those persons in this action.

Jack Isola
Davis Street Station for Material Recycling and Transfer
April 16, 2008
Page 12 of 17

## V.     Name and Address of Noticing Party.

Our name, address and telephone number is as follows:

Bill Jennings, Executive Director;
California Sportfishing Protection Alliance,
3536 Rainier Avenue,
Stockton, CA 95204
Tel. (209) 464-5067

## VI.    Counsel.

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Michael R. Lozeau                          Andrew L. Packard
Douglas J. Chermak                         Law Offices of Andrew L. Packard
Law Office of Michael R. Lozeau            319 Pleasant Street
1516 Oak Street, Suite 216                 Petaluma, California 94952
Alameda, California 94501                  Tel. (707) 763-7227
Tel. (510) 749-9102                        andrew@packardlawoffices.com
mrlozeau@lozeaulaw.com

## VII.   Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Davis Street Station to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Davis Street Station and its agents for the above-referenced violations upon the expiration of the 60-day notice period.  However, during the 60-day notice period, we would be willing to discuss effective remedies for the violations noted in this letter.  If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within the next 20 days

so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

cc:      CT Corporation, Agent of Service of Process for Waste Management of Alameda
         County, Inc. (C0091817) and Waste Management of California, Inc. (C0266196)

Notice of Violation and Intent to File Suit

## SERVICE LIST

Steve Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Michael Mukasey, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Wayne Nastri, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Bruce H. Wolfe, Executive Officer II
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

**ATTACHMENT A**
Rain Dates, Davis Street Station, San Leandro, California

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| April | 16 | 2003 | January | 02 | 2004 | November | 09 | 2004 |
| April | 21 | 2003 | January | 06 | 2004 | November | 10 | 2004 |
| April | 22 | 2003 | January | 08 | 2004 | November | 11 | 2004 |
| April | 24 | 2003 | January | 08 | 2004 | November | 13 | 2004 |
| April | 25 | 2003 | January | 09 | 2004 | November | 27 | 2004 |
| April | 27 | 2003 | January | 14 | 2004 | December | 06 | 2004 |
| April | 28 | 2003 | January | 23 | 2004 | December | 07 | 2004 |
| April | 29 | 2003 | January | 24 | 2004 | December | 08 | 2004 |
| May | 02 | 2003 | January | 26 | 2004 | December | 10 | 2004 |
| May | 03 | 2003 | January | 27 | 2004 | December | 26 | 2004 |
| May | 06 | 2003 | January | 30 | 2004 | December | 27 | 2004 |
| May | 07 | 2003 | February | 01 | 2004 | December | 28 | 2004 |
| May | 08 | 2003 | February | 02 | 2004 | December | 29 | 2004 |
| May | 30 | 2003 | February | 03 | 2004 | December | 30 | 2004 |
| July | 24 | 2003 | February | 06 | 2004 | December | 31 | 2004 |
| September | 03 | 2003 | February | 13 | 2004 | January | 01 | 2005 |
| November | 02 | 2003 | February | 15 | 2004 | January | 02 | 2005 |
| November | 03 | 2003 | February | 16 | 2004 | January | 03 | 2005 |
| November | 06 | 2003 | February | 17 | 2004 | January | 04 | 2005 |
| November | 07 | 2003 | February | 18 | 2004 | January | 05 | 2005 |
| November | 08 | 2003 | February | 20 | 2004 | January | 06 | 2005 |
| November | 09 | 2003 | February | 21 | 2004 | January | 07 | 2005 |
| November | 14 | 2003 | February | 22 | 2004 | January | 08 | 2005 |
| November | 15 | 2003 | February | 24 | 2004 | January | 09 | 2005 |
| November | 17 | 2003 | February | 25 | 2004 | January | 10 | 2005 |
| November | 30 | 2003 | February | 26 | 2004 | January | 11 | 2005 |
| December | 01 | 2003 | February | 27 | 2004 | January | 12 | 2005 |
| December | 02 | 2003 | March | 01 | 2004 | January | 13 | 2005 |
| December | 04 | 2003 | March | 25 | 2004 | January | 16 | 2005 |
| December | 05 | 2003 | March | 27 | 2004 | January | 17 | 2005 |
| December | 06 | 2003 | April | 18 | 2004 | January | 18 | 2005 |
| December | 07 | 2003 | April | 19 | 2004 | January | 19 | 2005 |
| December | 09 | 2003 | April | 20 | 2004 | January | 20 | 2005 |
| December | 10 | 2003 | April | 21 | 2004 | January | 21 | 2005 |
| December | 12 | 2003 | May | 28 | 2004 | January | 22 | 2005 |
| December | 13 | 2003 | August | 23 | 2004 | January | 23 | 2005 |
| December | 14 | 2003 | August | 24 | 2004 | January | 24 | 2005 |
| December | 19 | 2003 | September | 19 | 2004 | January | 25 | 2005 |
| December | 20 | 2003 | October | 17 | 2004 | January | 26 | 2005 |
| December | 21 | 2003 | October | 19 | 2004 | January | 27 | 2005 |
| December | 23 | 2003 | October | 20 | 2004 | January | 28 | 2005 |
| December | 24 | 2003 | October | 23 | 2004 | February | 07 | 2005 |
| December | 25 | 2003 | October | 25 | 2004 | February | 11 | 2005 |
| December | 28 | 2003 | October | 26 | 2004 | February | 14 | 2005 |
| December | 29 | 2003 | November | 03 | 2004 | February | 15 | 2005 |
| January | 01 | 2004 | November | 04 | 2004 | February | 16 | 2005 |

Notice of Violation and Intent to File Suit

## ATTACHMENT A
### Rain Dates, Davis Street Station, San Leandro, California

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| February | 17 | 2005 | November | 04 | 2005 | March | 21 | 2006 |
| February | 18 | 2005 | November | 07 | 2005 | March | 11 | 2006 |
| February | 19 | 2005 | November | 08 | 2005 | March | 13 | 2006 |
| February | 20 | 2005 | November | 09 | 2005 | March | 30 | 2006 |
| February | 21 | 2005 | November | 25 | 2005 | March | 04 | 2006 |
| February | 26 | 2005 | November | 28 | 2005 | March | 10 | 2006 |
| February | 27 | 2005 | November | 29 | 2005 | March | 28 | 2006 |
| February | 28 | 2005 | December | 01 | 2005 | March | 07 | 2006 |
| March | 01 | 2005 | December | 02 | 2005 | March | 01 | 2006 |
| March | 02 | 2005 | December | 07 | 2005 | March | 02 | 2006 |
| March | 03 | 2005 | December | 17 | 2005 | March | 09 | 2006 |
| March | 04 | 2005 | December | 18 | 2005 | March | 27 | 2006 |
| March | 09 | 2005 | December | 19 | 2005 | March | 12 | 2006 |
| March | 18 | 2005 | December | 20 | 2005 | March | 03 | 2006 |
| March | 19 | 2005 | December | 21 | 2005 | March | 16 | 2006 |
| March | 20 | 2005 | December | 22 | 2005 | March | 31 | 2006 |
| March | 21 | 2005 | December | 25 | 2005 | March | 06 | 2006 |
| March | 22 | 2005 | December | 26 | 2005 | March | 24 | 2006 |
| March | 23 | 2005 | December | 27 | 2005 | March | 14 | 2006 |
| March | 27 | 2005 | December | 28 | 2005 | March | 20 | 2006 |
| March | 28 | 2005 | December | 29 | 2005 | March | 25 | 2006 |
| March | 29 | 2005 | December | 30 | 2005 | March | 05 | 2006 |
| April | 03 | 2005 | December | 31 | 2005 | April | 01 | 2006 |
| April | 04 | 2005 | January | 06 | 2006 | April | 17 | 2006 |
| April | 07 | 2005 | January | 08 | 2006 | April | 15 | 2006 |
| April | 08 | 2005 | January | 13 | 2006 | April | 08 | 2006 |
| April | 22 | 2005 | January | 21 | 2006 | April | 10 | 2006 |
| April | 23 | 2005 | January | 03 | 2006 | April | 09 | 2006 |
| April | 27 | 2005 | January | 18 | 2006 | April | 05 | 2006 |
| April | 28 | 2005 | January | 11 | 2006 | April | 03 | 2006 |
| April | 29 | 2005 | January | 27 | 2006 | April | 07 | 2006 |
| May | 04 | 2005 | January | 07 | 2006 | April | 04 | 2006 |
| May | 05 | 2005 | January | 01 | 2006 | April | 12 | 2006 |
| May | 08 | 2005 | January | 17 | 2006 | April | 02 | 2006 |
| May | 09 | 2005 | January | 30 | 2006 | April | 11 | 2006 |
| May | 18 | 2005 | January | 28 | 2006 | April | 16 | 2006 |
| May | 19 | 2005 | January | 02 | 2006 | May | 24 | 2006 |
| June | 8 | 2005 | January | 14 | 2006 | May | 19 | 2006 |
| June | 09 | 2005 | February | 17 | 2006 | May | 21 | 2006 |
| June | 16 | 2005 | February | 04 | 2006 | June | 28 | 2006 |
| June | 17 | 2005 | February | 02 | 2006 | July | 20 | 2006 |
| June | 18 | 2005 | February | 26 | 2006 | July | 06 | 2006 |
| October | 14 | 2005 | February | 01 | 2006 | July | 21 | 2006 |
| October | 15 | 2005 | February | 27 | 2006 | August | 02 | 2006 |
| October | 26 | 2005 | February | 28 | 2006 | October | 05 | 2006 |
| October | 29 | 2005 | March | 29 | 2006 | October | 06 | 2006 |
| November | 03 | 2005 | March | 17 | 2006 | October | 17 | 2006 |

## ATTACHMENT A
### Rain Dates, Davis Street Station, San Leandro, California

| Month | Day | Year | Month | Day | Year | Month | Day | Year |
|---|---|---|---|---|---|---|---|---|
| November | 02 | 2006 | April | 14 | 2007 | December | 06 | 2007 |
| November | 03 | 2006 | April | 19 | 2007 | December | 07 | 2007 |
| November | 04 | 2006 | April | 20 | 2007 | December | 17 | 2007 |
| November | 09 | 2006 | April | 21 | 2007 | December | 18 | 2007 |
| November | 11 | 2006 | April | 22 | 2007 | December | 19 | 2007 |
| November | 12 | 2006 | April | 27 | 2007 | December | 20 | 2007 |
| November | 13 | 2006 | May | 02 | 2007 | December | 27 | 2007 |
| November | 14 | 2006 | May | 03 | 2007 | December | 28 | 2007 |
| November | 15 | 2006 | May | 04 | 2007 | December | 29 | 2007 |
| November | 23 | 2006 | May | 10 | 2007 | January | 03 | 2008 |
| November | 27 | 2006 | May | 11 | 2007 | January | 04 | 2008 |
| November | 28 | 2006 | May | 14 | 2007 | January | 05 | 2008 |
| December | 09 | 2006 | May | 15 | 2007 | January | 06 | 2008 |
| December | 10 | 2006 | May | 16 | 2007 | January | 07 | 2008 |
| December | 11 | 2006 | May | 17 | 2007 | January | 08 | 2008 |
| December | 12 | 2006 | May | 20 | 2007 | January | 09 | 2008 |
| December | 13 | 2006 | May | 21 | 2007 | January | 10 | 2008 |
| December | 14 | 2006 | May | 23 | 2007 | January | 21 | 2008 |
| December | 15 | 2006 | May | 24 | 2007 | January | 22 | 2008 |
| December | 16 | 2006 | May | 27 | 2007 | January | 23 | 2008 |
| December | 22 | 2006 | May | 29 | 2007 | January | 24 | 2008 |
| December | 27 | 2006 | May | 30 | 2007 | January | 25 | 2008 |
| January | 04 | 2007 | May | 31 | 2007 | January | 26 | 2008 |
| January | 05 | 2007 | June | 01 | 2007 | January | 27 | 2008 |
| January | 17 | 2007 | June | 03 | 2007 | January | 28 | 2008 |
| January | 26 | 2007 | June | 04 | 2007 | January | 29 | 2008 |
| January | 27 | 2007 | June | 06 | 2007 | January | 30 | 2008 |
| January | 28 | 2007 | June | 08 | 2007 | January | 31 | 2008 |
| February | 07 | 2007 | June | 10 | 2007 | February | 02 | 2008 |
| February | 08 | 2007 | June | 13 | 2007 | February | 03 | 2008 |
| February | 09 | 2007 | June | 14 | 2007 | February | 19 | 2008 |
| February | 10 | 2007 | June | 15 | 2007 | February | 20 | 2008 |
| February | 11 | 2007 | June | 19 | 2007 | February | 21 | 2008 |
| February | 12 | 2007 | June | 21 | 2007 | February | 22 | 2008 |
| February | 21 | 2007 | June | 22 | 2007 | February | 23 | 2008 |
| February | 22 | 2007 | September | 22 | 2007 | February | 24 | 2008 |
| February | 23 | 2007 | October | 09 | 2007 | March | 13 | 2008 |
| February | 24 | 2007 | October | 10 | 2007 | March | 14 | 2008 |
| February | 25 | 2007 | October | 12 | 2007 | March | 15 | 2008 |
| February | 26 | 2007 | October | 15 | 2007 | March | 28 | 2008 |
| February | 27 | 2007 | October | 16 | 2007 | March | 29 | 2008 |
| February | 28 | 2007 | October | 17 | 2007 | | | |
| March | 20 | 2007 | October | 19 | 2007 | | | |
| March | 26 | 2007 | November | 05 | 2007 | | | |
| April | 07 | 2007 | November | 10 | 2007 | | | |
| April | 09 | 2007 | November | 11 | 2007 | | | |
| April | 11 | 2007 | December | 04 | 2007 | | | |